363 So.2d 1223 (1978)
Kenneth AUBERT, Individually and as tutor of and administrator of the Estate of his minor daughter, Sandrell Aubert
v.
CHARITY HOSPITAL OF LOUISIANA at New Orleans, a Division of/and the Louisiana Health and Human Resources Administration and Lee Frazier, Administrator of Charity Hospital of Louisiana, at New Orleans, Dr. William Stewart, Commissioner of the Louisiana Health and Human Resources Administration, Dr. John Adriani, Dr. Max Yarbrough, Dr. Byung Chung and Elvyn Lee.
No. 9148.
Court of Appeal of Louisiana, Fourth Circuit.
October 10, 1978.
Writ Refused December 1, 1978.
*1225 Bernard E. Burk, Leonard A. Washofsky, New Orleans, for plaintiffs-appellees/appellants.
William J. Guste, Jr., Atty. Gen., Joseph W. Thomas, Asst. Atty. Gen., Ronald C. Davis, Staff Atty., New Orleans, for defendants-appellants/appellees.
Lemle, Kelleher, Kohlmeyer & Matthews, Vance E. Ellefson, New Orleans, for defendants-appellees Dr. John Adriani, Dr. William M. Yarbrough and St. Paul Fire and Marine Ins. Co.
Before LEMMON and BOUTALL, JJ., and EASON, J. Pro Tem.
LEMMON, Judge.
These are two separate appeals from a judgment rendered after a trial on the merits of a medical malpractice claim.
Mrs. Kenneth Aubert died following childbirth by Caesarean section under general anesthesia at Charity Hospital. Her widower and the child filed this suit for damages against Charity; Dr. Byung Chung, a first-year resident in anesthesiology; Elvyn Lee, a student nurse anesthetist; Dr. John Adriani, the director of Charity's department of anesthesiology; Dr. W. Max Yarbrough, the assistant director; and others not involved in these appeals. Charity invoked R.S. 13:5104 and objected to plaintiffs' request for trial by jury, and the proceedings were held as a bifurcated trial, with the claim against the individual defendants being tried by the jury and the claim against Charity tried by the judge.
Answering special interrogatories, the jury found that none of the individual defendants were liable. The judge refused to disturb the verdict, noting "(t)here is much room for disagreement", but in determining Charity's liability concluded "I must follow my own conviction" and found as a fact that Charity's employees, Dr. Chung and Nurse Lee, were negligent, making Charity vicariously liable for plaintiffs' damages. The ensuing judgment according dismissed *1226 plaintiffs' claims against the individual defendants and granted an award against Charity. Plaintiffs and Charity have filed separate appeals.
Function of Appellate Court
An appellate court in Louisiana ordinarily reviews a record on appeal by applying the standard that the factual findings of the judge or jury will not be disturbed if the record contains credible evidence to support such findings. This is not simply a court-made standard of review, but is a recognition of the difference in functions between the trial court and the appellate court. The primary function of the trial court in cases involving mostly factual issues is to find the facts. Once that function has been performed, the appellate court (although in Louisiana vested by the Constitution with the power to review facts) does so simply by determining from the record whether there is sufficient evidence to reasonably support these findings.
When the record does not contain sufficient credible evidence to support the findings of the judge or jury, the decision of the trial court is set aside, and the appellate court in exercising its constitutional power then proceeds to find the facts based on its independent review of the record, without regard to the findings of the original trier of fact.[1] But if after review of the record the appellate court finds that there is sufficient credible evidence to support the judgment of the judge or jury, then the appellate court should accept those findings. Were the appellate court called upon in every case to make its own independent findings of fact based on its power of appellate review, then there would be little need or purpose for a trial court. The policy which requires appellate courts to accord great weight to the factual findings of the judge or jury is simply a recognition of the principle that the fact finding function is primarily vested in the trial courts.
The present case involves an unusual function of the appellate court in Louisiana in that a single trial resulted in inconsistent findings of fact by the judge and by the jury, each of which had the power and authority to find facts necessary to determine the liability of the particular defendant whose liability was being tried by the particular trier of fact. Once each trier of fact has performed its function under such circumstances, the findings of the jury do not prevail over those of the judge. The judge trial is not (as Charity suggests) an inferior tribunal which is required to accept the factual findings of the jury and then proceed to decide the remaining issues in the case against the particular defendant in the judge trial.[2] The judge had the right, power and duty to make independent factual findings, based upon his appreciation of the evidence, as was necessary to determine the liability of the defendant in the judge trial, and in doing so the judge was not bound to accept the inconsistent factual findings of the jury, even if the record supported those findings.
On appeal neither trier of fact is entitled to have greater weight accorded to its factual findings.[3] Therefore, it is necessary *1227 for the appellate court to make its own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent.
Basis of Trial Judge's Findings
Charity's vicarious liability was based on the trial judge's findings that the resident anesthesiologist and anesthetist inserted an endotracheal tube into the esophagus, rather than the trachea, and then failed to discover the mistake timely, resulting in hypoxia (deprivation of oxygen to the brain), irreversible brain damage, and death.
The endotracheal tube is designed to be placed in the trachea, which leads to the lungs, so that the anesthetist ventilates the patient (by squeezing a bag connected between the anesthesia machine and the endotracheal tube) and actually breathes for the patient, whose muscles have been paralyzed by administration of a drug, anectine. All experts agreed that it would be below the standards of acceptable medical practice to insert the tube into the esophagus, which leads to the stomach, and to allow it to remain there without the problem being recognized. Thus the critical issue is whether the evidence preponderates in favor of a conclusion that the endotracheal tube was not properly placed in the trachea.
Expert testimony also established that initial insertion of the tube into the esophagus (located immediately adjacent to the trachea) is not rare and that the anesthesia team must check for proper insertion by visualizing the vocal cords during intubation, if possible, to determine that the tube passes between the vocal cords, then by observing that the chest moves up and down upon ventilation, and finally by listening with a stethoscope for breath sounds in the lungs on both sides of the chest. Under the outlined procedure the anesthesiologist, once intubation is completed and checked, notifies the surgeon, who immediately proceeds with the incision.
Pertient Facts
Mrs. Aubert, then 18 years old, was in her first pregnancy and had no prior history of heart, lung or vascular problems. Because of a pelvic disproportion the obstetrician determined a delivery by Caesarean section was necessary. After premedication Mrs. Aubert, who was in mild labor, was preoxygenated for ten minutes (1:10 to 1:20 p. m.), was then given a general anesthetic (50% oxygen and 50% cyclopropane) for two minutes while breathing her own, and at 1:22 was given anectine (which takes effect in about 45 seconds) to paralyze the muscles during the surgery. At about 1:23 the anesthetist inserted the tube and reported that the chest was expanding and that breath sounds were heard, and the obstetrician made the incision at 1:24. The anesthesia agent was switched to ethylene and oxygen, and an anectine drip was started.
The baby was delivered at 1:29, and the cord was clamped and the placenta was delivered intact in the next one to two minutes. Within a minute after delivery of the placenta the assisting obstetrician observed Mrs. Aubert's blood was becoming dark and reported this to Dr. Chung. (At this time there was no change in the electrocardiogram, blood pressure or pulse rate, and no difficulty in ventilation).
Nurse Lee and Dr. Chung cut off the ethylene and switched to 100% oxygen, checked the chest expansion, the breath sounds and the anesthesia machine, checked the placement of the tube with a laryngoscope, and then suctioned the tube and determined it to be free of obstructions. However, the blood continued to darken, despite the administration of pure oxygen. Mrs. Aubert's uterus became flaccid, and her pulse dropped rapidly. About the same time Dr. Chung noticed the bag was a "little hard" to squeeze, and he removed the tube and attempted to reinsert it. When he was unable to do so (reportedly because of excessive saliva in the patient's mouth and because the patient was not relaxed), he inserted a plastic airway and ventilated the patient by mask. At 1:40 (about the same time that the tube was removed) Mrs. Aubert *1228 went into cardiac arrest, whereupon the surgeons applied cardiac massage. About three minutes after application of the oxygen mask Mrs. Aubert's blood began to brighten slightly, and at about 1:50 she was successfully resuscitated. At 1:52 Dr. Dileo, Dr. Chung's supervisor who had been summoned, arrived and inserted the tube successfully. A "few minutes" thereafter Mrs. Aubert's blood became bright red.[4] The surgeons noticed a large amount of gas in her bowels, and the gas was suctioned out with a nasal-gastric tube. The incision was closed, and Mrs. Aubert was taken to intensive care. The lungs were checked and X-rayed and found to be clear and normal, and coagulate tests were normal, but neurological examination revealed brain damage. She never regained consciousness and died eight days later.
Proof of Causation
Plaintiffs presented several medical experts who opined that the most likely cause of the hypoxia was a problem with the endotracheal tube. Dr. Floyd Hindelang, who was a second-year resident in obstetrics at the time and assisted in the surgery, noticed the blood "was getting darker" about two minutes after delivery of the placenta. Dr. Kermit Roux, the chief of anesthesia at a local hospital, described the pattern thereafter as one which generally fits intubation into the esophagus: The dark blood appeared about eight minutes after the initial intubation (the preoxygenation was sufficient to have kept the red cells saturated with oxygen for five to ten minutes); the blood continued to darken although the patient was switched to 100% oxygen (blood can only improve on 100% oxygen, if the oxygen is getting to the lungs); removing the tube and ventilating the patient with a mask produced a pinkening of the blood (some oxygen to the lungs, rather than no oxygen, would cause improvement in a few minutes); and after reintubation the blood improved remarkably and the blood gases returned to normal. Dr. Roux also observed that it is easy to misinterpret breath sounds and to mistake the stomach rising against the ribs as expansion of the chest.
Dr. Roux admitted that hypoxia can be caused by an embolism, but discounted that possibility because a pulmonary embolism or any condition which would cause such low oxygenation, without improvement on 100% oxygen, would damage the lungs and would not be returned to normal in 20 minutes. He also noted that in case of an embolism difficulty in ventilation, bronchial spasm and other signs would precede the darkening of the blood, while dark blood was the first sign of a problem in this case, at which time the patient's chest sounds were clear and no difficulty in ventilation had yet been experienced.
Dr. Hindelang confirmed that the sequence of happenings indicated a problem with the endotracheal tube was the most probable cause of the hypoxia.
Dr. James Riley, a senior obstetrical resident at Charity at the time who was called in when the emergency occurred, stated his belief that a technical problem with the endotracheal tube was the most probable cause of the hypoxia. He particularly emphasized that there was no residual damage to the lungs, which are not as sensitive as the brain to low levels of oxygen, reasoning that an embolus large enough to cause such severe hypoxia would also cause residual lung damage.
Dr. Sidney Jacobs, an internist with a subspecialty in pulmonary diseases, testified that the increase in carbon dioxide, as was shown by blood gas analysis, could only mean that the patient was not breathing, either on her own or through the efforts of the anesthesia team, further observing that while low oxygen is caused by several things, high carbon dioxide in the blood is caused only by failure of the lungs to breathe it out. He stated that the normal chest X-ray and the ability of her lungs to *1229 bring the blood partial pressure of oxygen to 475 (from 60) late in the surgery indicates she had good lungs going into and coming out of surgery. He also observed that preoxygenation builds up a reserve of oxygen for a period without oxygen, stating that a preoxygenated patient can go 10 to 15 minutes without oxygen before cardiac arrest.
Dr. Jacobs steadfastly maintained that all medical evidence (including excessive gas in the stomach) was consistent with placement of the tube in the esophagus, while none of the evidence was inconsistent. On the other hand, he ruled out, because of inconsistent indicia, (1) severe pulmonary vasospasm (no pulmonary edema, no changes in electrocardiogram, and no discernible rales or noises in the lungs); (2) amniotic fluid embolism (no massive bleeding, no pulmonary edema, no intense shock, no tachycardia; also inconsistent was Mrs. Aubert's first pregnancy, her mild labor, and the fact of the problem's clearing up in 20 minutes); (3) air embolism (no churning noise in heart, which would have been heard through stethoscope by anesthesiologist, no stroke, no heart dysfunction, no high fever; also, not usually a cause of death by hypoxia); and (4) thromboembolism (no injury to vein, no sluggishness of circulation, no tendency of blood to clot). Furthermore, he noted that in the case of an embolism the administration of 100% oxygen (with a properly placed tube) would immediately lighten the blood, and that it would take days or weeks, rather than minutes, for the damage to clear up.
On the other hand, defendants relied on expert opinion that intubation was in fact in the trachea if the vocal cords were visualized during insertion of the tube, if bilateral breath sounds were heard, and if chest expansion was observed upon ventilation. Dr. Chung and Nurse Lee testified that all three of these checks were made, and their supervisors and department directors testified it was unlikely they were lying or mistaken.
Dr. Martin Ziskind, an expert on pulmonary diseases, could not come up with a diagnosis consistent with the evidence. He considered an air embolism or a pulmonary thromboembolism as highly unlikely. While he admitted there were many inconsistencies in the diagnosis of amniotic fluid embolism, he believed that was more likely than improper intubation, because the high volume flow of oxygen through the esophagus would have caused distention of the stomach and the smell of ethylene escaping around the tube into the operating room.[5] He theorized that a chemical, serotonin, was produced by material coming from the uterus to the lungs and that a reflex reaction to the chemical caused a vasospasm, or constriction of the blood vessels, which produced concurrently or shortly thereafter a bronchospasm, or constriction of the small tubes in the lungs. He admitted that a vasospasm should be reflected on electrocardiographic or blood pressure or pulse measurements (which did not appear in this case) and that a bronchospasm would produce difficulty in ventilation (which did not occur until a considerable length of time after dark blood was noticed), and he conceded the difficulty of explaining why the dark blood (caused by bronchospasm) occurred long before difficulty in ventilation (which should occur immediately upon bronchospasm).
Dr. Frank Faust, an anesthesiologist at a local hospital, definitely attributed the death to an amniotic fluid embolism because of the presence of "cardinal symptoms", namely difficulty in ventilation, cyanosis (dark blood) due to changes in the lungs, circulatory collapse, loss of tone in the uterus, and coagulation failure in the blood. He stated that there was only one death from that cause in 31 years at his hospital, but focused on that cause because the others of the most common causes were clearly inapplicable to this case. He emphasized there was no problem until delivery of the placenta, which was the likely time amniotic fluid was released, theorizing that a clot from material in the fluid immediately *1230 threw the whole pulmonary vascular system into spasm. He insisted that ventilation was impossible when the dark blood appeared, but probably was not noticed right away because of the emergency situation. While also there was no evidence of failure of coagulation, which usually involves massive bleeding, he explained that patients don't bleed after cardiac arrest. He further explained that pulmonary edema does not necessarily occur with amniotic fluid embolism, although it usually does.
Dr. John Parmley, the director of anesthesiology at a local hospital, chose embolic phenomena as the most likely cause of death. He noted that the bag can be squeezed unless the bronchospasm completely cuts off oxygen to the lungs.
Dr. Adriani ruled out the placement of the tube in the esophagus, because if there was no oxygen whatsoever the blood would have been somewhat discolored at the time of the original incision. He disregarded the value of preoxygenation, noting that the body does not store oxygen. Because the blood became dark after the placenta was released, he favored the diagnosis of an amniotic fluid embolism, which constricted the blood vessels, releasing serotonin and immediately causing vasospasm and partial bronchospasm (partial because she could be ventilated somewhat). In his opinion the spasm caused diminution in circulation, and the blood flow was not fast enough to pick up oxygen in the lungs and to keep the blood pink.
The testimony of two pediatricians, one presented by each side, was enlightening as to the use of an Apgar score in the evaluation of a baby, but their conclusions turned more on the effect of preoxygenation of the mother, a point more within the expertise of lung specialists.
Neither Dr. Yarbrough nor Dr. Dileo expressed an opinion on causation.
Liability of Dr. Chung, Nurse Lee and Charity
Causation, like any other fact, may be proved by direct or circumstantial evidence, and the proof is sufficient to constitute a preponderance when, taken as a whole, it shows the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). A plaintiff has successfully borne the burden of proof when the evidence taken as a whole indicates the defendants' negligence was the most plausible or likely cause of the occurrence and no other factor can as reasonably be ascribed as the cause. Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972).
For the diagnosis of improper intubation to be accepted, the testimony of Dr. Chung and Nurse Lee must be discounted as incorrect. Nevertheless, no other diagnosis comes near fitting the pattern of events, and the diagnosis of improper intubation virtually fits the pattern exactly.
Administration of 100% oxygen into the lungs will effect improvement in the blood, if hypoxia is caused by partial bronchospasm following an embolism or by any other condition, but there was no improvement in this case. Indeed, there was some improvement after the tube was removed and oxygen was administered by mask, although in that method not all of the oxygen goes to the lungs (while with a properly placed endotracheal tube all oxygen goes into the lungs). Then there was dramatic improvement after Dr. Dileo inserted the tube into the trachea.
Other factors supporting the conclusion that improper intubation was the most probable cause of death are: The absence of evidence of residual damage to the lungs or of pulmonary edema; the absence of electrocardiographic, pulse and blood pressure changes (symptoms of vasospasm) prior to the appearance of dark blood; the absence of difficulty in ventilation (symptom of bronchospasm) until about nine minutes after dark blood was noted; the presence of good breath sounds and chest movement after dark blood was noted; the presence of a large amount of gas in the bowels; the low oxygen and high carbon dioxide content of the first blood gas test taken after a great deal of oxygen was administered *1231 by mask (indicating prior ventilation had been inadequate); the high oxygen and low carbon dioxide content of the second blood gas test (indicating the lungs were good enough to function adequately after 100% oxygen was administered by means of a properly inserted endotracheal tube); the absence of massive bleeding and tachycardia, which along with pulmonary edema generally occur in amniotic fluid embolisms; the fact that amniotic fluid embolisms generally occur in older women with multiple pregnancies following hard labor and seldom occur with section deliveries where the placenta is intact; and the fact that pulmonary thromboembolisms generally occur in older persons with sluggish circulation and seldom occur during surgery. Finally, the fact of a healthy child is adequately explained by the quick delivery and by the use of preoxygenation, a procedure which must be of some value since it is employed by Charity and most other hospitals in nonemergency section deliveries.
On the overall evidence in this record the most likely cause and most plausible explanation of the death was improper intubation. No other factor can as reasonably be ascribed as the cause. Dr. Chung and Nurse Lee, along with their employer, Charity Hospital, are therefore liable for plaintiffs' damages.
Liability of Drs. Adriani and Yarbrough
Both the judge and jury found that Charity's director and deputy director of the department of anesthesiology were not liable. Plaintiffs alleged Drs. Adriani and Yarbrough were liable because they should have known the anesthesiologist and anesthetist were not competent to handle the assignment and because they failed to provide proper supervision in the operating room or to have supervisors in close proximity thereto.
There was considerable expert testimony that the training provided to Dr. Chung and Nurse Lee was adequate for them to handle the assignment. Indeed, not even plaintiffs' experts disputed this. Moreover, there was no showing of any deficiency in the competency or qualifications of either.
There was also no showing of any need for immediate supervision in this particular case or that any negligence by Drs. Adriani and Yarbrough in providing supervision was a legal cause of this tragedy. Moreover, Dr. Dileo (Dr. Chung's supervisor) testified that he arrived in the operating room within three minutes of being summoned by telephone.
Review of the record reveals no manifest error in the judgment dismissing these defendants.
Quantum
The judgment awarded $40,000.00 to Mr. Aubert and $60,000.00 to the child for loss of love and affection and $75,000.00 to Mr. Aubert and $25,000.00 to the child for loss of income production (and for the widower, loss of household services), as well as the funeral expenses. Plaintiffs' appeal questions (1) the failure to award any amount for conscious pain and suffering and (2) the adequacy of the awards for loss of income production.
Plaintiffs' contention as to conscious pain and suffering by Mrs. Aubert is based on the inference that after the initial anesthesia (two minutes of cyclopropane) wore off, the continuing anesthesia (ethylene) did not take effect because the tube was improperly placed. Of course, Mrs. Aubert could not communicate pain because her muscles were paralyzed.
Dr. Roux, who also had a degree in pharmacology, testified that the initial anesthesia would have been effective for about five minutes and that, in the absence of additional anesthesia, Mrs. Aubert would have experienced pain thereafter until she became unconscious in perhaps another five or ten minutes.
Although reasonable minds could reach different conclusions, we cannot say the trial judge erred manifestly in his apparent conclusion that this evidence was too speculative to support an award.
An expert in economics testified as to the loss of income production and domestic *1232 services. He made two calculations of her projected earnings as a licensed practical nurse through age 60, the year which corresponded with the end of Mr. Aubert's life expectancy. The first calculation was based on the assumption that she would have reentered employment six weeks after the child's birth, and the second was based on the assumption she would have returned to work at age 35, the average beginning age for mothers to enter the labor market. He also computed the value of her household services, including child care, at the current hourly rate for the services she might reasonably have been expected to perform. After appropriate adjustment for increases attributable to productivity and rising cost of living and for decreases attributable to periods of unemployment, and further deduction of an amount attributable to her personal expenditures, he applied a discount rate of 6-3% to these amounts. His final calculations were $238,000.00 and $184,000.00 respectively as the amounts necessary in a fund today to provide $475.00 monthly (her gross salary at date of death) and the monthly value of her household services (never stated in dollars by the expert) over the respective periods, with the fund being exhausted at the end of the period.
An award of damages to a widower and children for loss of the wife and mother's income productivity and household services cannot be calculated with mathematical certainty. Sound judicial discretion must be exercised after weighing all proper considerations, including the deceased spouse's physical condition, her work and earning records, the ages of the widower and children, and the probability that the deceased spouse would have returned to work and earned similar amounts on a regular basis except for the injury or death. The difficulty of calculation with certainty is even more evident when the spouse dies at an exceptionally early age, as in this case, because no pattern of work performance and earnings has been established and because many unknown factors affect the likelihood of future earnings.
This record does not demonstrate an abuse of judicial discretion in the light of all considerations. The expert made no allowance for income taxes and used her gross income, which was never truly available to the couple. He also used statistics for registered nurses and professionals in considering salary increases and periods of unemployment. The amount attributed to the decedent's personal expenditures appears to be very low, as compared to her projected income over the same period. Finally, in calculating the amount attributable as the value of her household services, the expert provided virtually no explanation. Apparently he did not consider the household services the husband would have performed himself, even if the wife had lived, nor other probabilities relating to expenditures for those services. The award of $100,000.00 constituted a proper exercise of discretion.
Decree
Accordingly, the judgment of the trial court is reversed in part to include Dr. Byung Chung and Elvyn Lee as defendants cast in judgment. In all other respects the judgment is affirmed.
REVERSED IN PART, AFFIRMED IN PART.
NOTES
[1] This is in contradistinction to appellate courts in states without appellate review of fact, where retrials are usually necessary following appellate reversal (especially after prejudicial and erroneous rulings on admissibility of evidence or jury instructions).
[2] The present case does not involve a pure jury trial, in which the trial judge is incidentally called upon to apply the legal issue of vicarious liability based on the jury's answers to special interrogatories. Rather, this case involves two entirely separate trials of some defendants before a judge and of other defendants before a jury. The statutory requirement that the State's liability be tried by the judge is not fulfilled if the judge is relegated to applying vicarious liability based entirely on the jury's factual findings.
[3] This reasoning is consistent with the decision in Thornton v. Moran, 343 So.2d 1065 (La. 1977), in which the Supreme Court reversed an affirmation by the intermediate court of inconsistent conclusions of the two triers of fact in a bifurcated trial and remanded with instructions "to resolve the differences in the factual findings between the jury and the judge . . . and to render a single opinion based upon the record". It is evident the Supreme Court rejected any notion that the findings of either trier of fact were entitled to greater weight.
[4] Blood gases drawn at 1:50 (shortly before reintubation) showed a very high carbon dioxide content and a very low oxygen content. In a sample taken at 2:20 the results were reversed, with a high oxygen content and a low carbon dioxide.
[5] The anesthesia machine was a semiclosed type, vented by a pop-off valve into the room.