461 So.2d 1170 (1984)
Peggy Gruber BISHOP, Plaintiff-Appellant-Appellee,
v.
SHELTER INSURANCE COMPANY, et al., Defendants-Appellants-Appellees.
No. 83-1060.
Court of Appeal of Louisiana, Third Circuit.
December 12, 1984.
Rehearing Denied January 15, 1985.
Writ Denied March 22, 1985.
*1172 J. Edward Knoll of Knoll, Roy & Spruill, Marksville, for plaintiff-appellee-appellant.
Bolen & Erwin, Ltd., James A. Bolen, Jr., Alexandria, for defendant-appellant-appellee.
Gold, Little, Simon, Weems & Bruser; Sam N. Poole, Jr., Gist, Methvin, Hughes & Munsterman, DeWitt T. Methvin, Jr., Alexandria, for defendants-appellees-appellants.
Robert E. Tillery, Baton Rouge, Ben C. Bennett, Jr., Marksville, John W. King, Baton Rouge, for defendants-appellees.
Before FORET and CUTRER, JJ., and CULPEPPER, Judge Pro Tempore.
CULPEPPER, Judge Pro Tem.
The plaintiff, Peggy Gruber Bishop, seeks damages for her own personal injuries and for the wrongful death of her husband, William R. Bishop, arising out of an automobile accident which occurred at about 2:15 a.m. on December 13, 1981 on U.S. Highway 71 approximately four miles south of Bunkie, Louisiana. Plaintiff and her husband were passengers on the rear seat of a Pontiac Firebird being driven by the defendant, Mrs. Ollie McGhee. The McGhee vehicle was traveling in a northerly direction on this two-lane, two-way highway and collided in the south bound lane of traffic with a Mercury automobile being driven by the defendant, Eunice Edwards. Named as defendants are: (1) Mrs. Ollie McGhee, driver of the Pontiac, and her liability insurer, State Farm Mutual Automobile Insurance Company; (2) Eunice Edwards, driver of the Mercury, and his liability *1173 insurer, Shelter Insurance Company; (3) the Louisiana Department of Transportation and Development, on the theory that a cause of the accident was a defect in the shoulder of the highway which caused Ollie McGhee to lose control and spin across the highway into the path of the Edwards vehicle.
In a bifurcated trial beginning on August 29, 1983, a jury of 12 heard the case as to the individual defendants, and the judge heard the case as against the Louisiana Department of Transportation and Development. The jury found both vehicle drivers negligent and, under our comparative negligence law, attributed 10% of the fault to Eunice Edwards and 30% to Mrs. Ollie McGhee. The award of damages by the jury totaled $477,600. Following announcement of the jury verdict, the trial judge dictated written reasons finding no negligence on the part of the Louisiana Department of Transportation and Development because the plaintiff had failed to prove by a preponderance of the evidence that there was any defect in the shoulder of the highway. All parties appealed, except the Louisiana Department of Transportation and Development.
The substantial issues are: (1) Does the provision of LSA-R.S. 13:5105 prohibiting trial by jury of a suit against the State violate the equal protection provisions of the State or Federal Constitutions? (2) What are the applicable rules of appellate review in this bifurcated trial? (3) Was the jury clearly wrong in finding Eunice Edwards at fault? (4) Was the jury clearly wrong in finding Mrs. Ollie McGhee at fault? (5) Was the trial judge clearly wrong in finding no fault on the part of the Louisiana Department of Transportation and Development? (6) Did the trial judge err in refusing to allow the defendants to cross-examine plaintiff and her witnesses as to her remarriage and her present emotional condition? (7) Did the trial judge err in refusing to permit review by the jury of the limits of coverage of the insurance policies introduced into evidence by the defendants? (8) Did the trial judge err in submitting to the jury interrogatories as to twelve separate items of damages? (9) Did the trial judge err in not submitting to the jury the issue of any fault by the Department of Transportation and Development? (10) Did the trial judge err in refusing to give certain jury instructions requested by the plaintiff? (11) Were certain items of the awards either excessive or duplicative?

CONSTITUTIONALITY OF STATUTE PROHIBITING JURY TRIAL IN SUIT AGAINST THE STATE
Plaintiff argues first that the provision of LSA-R.S. 13:5105 prohibiting jury trials in actions against the State or an agency thereof violates the equal protection provisions of the Louisiana and United States Constitutions. Plaintiff quotes at length from a dissenting opinion by Judge Redmann in Carter v. City of New Orleans, 327 So.2d 488 (La.App. 4th Cir.1976).
This constitutional issue was neither raised nor ruled upon in the trial court. Jurisprudence has established the general rule that an attack on the constitutionality of a state statute cannot be made in the appellate court where it has not been raised and adjudicated in the trial court. Ryals v. Home Insurance Company, 410 So.2d 827 (La.App. 3d Cir.1982), writs denied, 414 So.2d 375 and 376 (La.1982); Succession of Dupree v. Miller, 433 So.2d 372 (La.App. 3d Cir.1983), writ denied, 440 So.2d 732 (La.1983). We note one case, Crosby v. Crosby, 434 So.2d 162 (La.App. 5th Cir. 1983) which, without discussion, held to the contrary in its original opinion, but the court granted a rehearing, after which the case was settled and dismissed as being moot, 442 So.2d 1248 (La.App. 5th 1983).
In the present case, we see no reason not to apply the general rule that attacks on the constitutionality of a state statute not urged in the trial court cannot be raised for the first time in the court of appeal. Therefore, we will not consider the constitutional issue.

RULES OF APPELLATE REVIEW IN THIS BIFURCATED TRIAL
In a bifurcated trial where the jury and the judge reach conflicting findings of *1174 fact and there is an appeal, the court of appeal should resolve these differences and render a single harmonized decision based upon the record as a whole. Moran v. Thornton, 341 So.2d 1135 (La.App. 1st Cir. 1976), writ granted and case remanded to the Court of Appeal with instructions, 343 So.2d 1065 (La.1977), decision on remand, 348 So.2d 79 (La.App. 1st Cir.1977), writs refused, 350 So.2d 897, 898, 900 (La.1977); Bunkie Bank & Trust Company v. Avoyelles Parish Police Jury, 347 So.2d 1305 (La.App. 3d Cir.1977); Whittington v. Sowela Technical Institute, 438 So.2d 236 (La.App. 3d Cir.1983), writ denied, 443 So.2d 591, 592 (La.1983).
Plaintiff argues that where the jury and the judge make conflicting findings of fact in a bifurcated trial, the "manifest error rule" is inapplicable, and neither trier of fact is entitled to have greater weight accorded to its factual findings. There are court of appeal decisions applying this rule. Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La.App. 4th Cir.1978), writ denied 365 So.2d 242; and Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.1983), writ not considered, 437 So.2d 1135 (La.1983). The Third Circuit Court of Appeal has stated the rule in a somewhat different way in Deville v. Town of Bunkie, 364 So.2d 1378 (La.App. 3d Cir. 1978), writ denied, 366 So.2d 564 (La.1979), where the court considered the entire record and found the factual conclusions of the trial judge "more reasonable" than those of the jury.
Plaintiff argues that in the present case the finding of fact by the jury that Edwards was 10% at fault and Mrs. McGhee 30% necessarily implies that the Department of Transportation was 60% at fault, which conflicts with the finding of fact by the trial judge that the Department of Transportation was not at fault. Plaintiff points out that in his charge to the jury the trial judge instructed that the percentage of fault assigned to either one of the individual defendants or both combined could be less than 100%, but that only the judge could determine whether the State was negligent and the percentage thereof. Moreover, although the record before us does not show it, the jury apparently did make a penciled notation on its verdict form that 60% of the negligence was attributable to the Department of Transportation. When the jury verdict was handed to the judge he noticed this improper penciled notation and ordered it erased. From these arguments we recognize the jury's intention must have been to find 10% of the fault attributable to Edwards, 30% to Mrs. McGhee and 60% to the Department of Transportation.
However, regardless of the jury's intention, it did not, as a matter of law, have the right or the duty to determine whether the Department of Transportation was at fault and, if so, the percentage thereof. LSA-R.S. 13:5105 clearly provides that, "No suit against the state or a state agency or a political subdivision shall be tried by jury." Thus, as a matter of law, the jury verdict has no weight on the issue of the State's fault. Under this view, there is no conflict between the finding of fact by the jury and that by the judge on the issue of the State's fault. It follows that since there is no conflict between the triers of fact, there is no need for the Court of Appeal to harmonize in accordance with the jurisprudence discussed above. It also follows that in our appellate review of the facts found by the jury and the facts found by the trial judge the applicable rule will be the well established test of whether the trier of fact was clearly wrong.
Counsel for Eunice Edwards argues that the apparently inconsistent findings of fact with regard to the State's fault has such an effect on the apportionment of fault among the individual defendants that the manifest error (clearly wrong) rule should be inapplicable to this appeal. This is a respectable argument, but one which we need not answer, because, for the reasons expressed hereafter, we conclude that even applying the clearly wrong rule, the evidence was insufficient to find fault on the part of Eunice Edwards. We also ultimately conclude the trial judge was not clearly wrong *1175 in finding no fault on the part of the State. Additionally, we find the jury was not clearly wrong in finding fault on the part of Ollie McGhee. This means that the accident was caused solely by the negligence of Ollie McGhee and thus no apportionment of fault is required in this case under LSA-C.C. art. 2324.

FAULT OF EUNICE EDWARDS
The next issue is whether the jury was clearly wrong in finding Eunice Edwards at fault. Edwards testified that on the night of the accident he had gone to the "Big Wheel," a lounge in Bunkie, where he remained until about 2:00 a.m. On leaving the lounge, he drove south on Highway 71 toward his home in Lemoyen, at a speed of between 45 and 55 miles per hour. He denies being under the influence of intoxicating liquor and there is no evidence that he was. He did not remember seeing any other vehicles traveling south in front of him. It was misting rain, and the highway was wet. His first recollection of the McGhee vehicle was when he saw it skidding from the northbound lane into his path in the southbound lane. There is no question that the point of impact, as found by the investigating state troopers, was in the southbound lane approximately 6 feet west of the centerline of the highway. Edwards denied that his vehicle ever went into the northbound lane.
The evidence shows that William Bishop, the decedent, and Louis McGhee were both football coaches at Alexandria Senior High School. They and their respective wives had gone from Alexandria to New Orleans to attend the State High School Football Play-offs at the Super Dome. After the last game, they left New Orleans at about 10:30 or 11:00 p.m. with Louis McGhee driving and his wife, Ollie, on the front seat. Mr. and Mrs. Bishop were on the back seat. At some point after they passed through Baton Rouge, Ollie McGhee started driving, and Louis McGhee took her place on the front seat. Ollie McGhee testified that as they approached Bunkie she was meeting some cars and the first car was coming over in her lane, so she swerved to miss the car and drove into some gravel and the car started spinning. She said she could feel her car go onto the shoulder and that she tried to steer back onto the highway, but her vehicle started spinning and she lost control and skidded into the southbound lane, where, of course, the evidence shows she struck the oncoming Edwards vehicle. At no point in her testimony does she say it was the Edwards vehicle which was the lead vehicle that crossed into her lane of travel. At the trial, she testified under cross-examination as follows:
"BY MR. POOLE:
Mrs. McGee, do you have any idea as to the description of the vehicle that crossed the centerline of the highway before you went onto the shoulder?
A. No, I don't.
Q. Do you have any idea as to how close the vehicle that crossed the center line was to your car, when it actually did cross the centerline?
A. No, in actual distance, I don't; I just know it was close enough that I felt I had to do something to avoid being hit.
Q. Did you feel that that car would have collided with your vehicle had you not swerved?
A. Yes.
Q. Based upon your answer to that question, isn't it true that the car that actually came across the centerline went on down the road?
A. Well, I don't know that for sure."
In her pretrial deposition, Mrs. McGhee had given a slightly different version:
"Q. Okay. When that car came across the centerline, how far werewas your vehicle away from it in car lengths or any other measurement that you can give me?
A. I really can't say. I justlike I said before, I just knew it wasit was close enough to where if I hadn't swerved it would have hit us.
Q. You did not hit that car. It went on down the highway?
A. Yes, I feel pretty sure it did. Yes."
*1176 Louis McGhee testified positively that as the line of cars approached from the north, the lead vehicle crossed into the northbound lane and his wife swerved to the right and successfully avoided colliding with that vehicle but then went into the southbound lane where she struck the Edwards vehicle. Louis McGhee testified at the trial as follows:
"Q. Mr. Edwards, howI'm sorry again. Mr. McGhee, how near or how far was the vehicle that crossed the center line when you first noticed it?
A. Well, my estimation was four or five car lengths. Now, you know, it was night time, but you know, that's my estimation.
Q. If your wife had not taken evasive actions, would uh, would an immediate collision have occurred?
A. I think so.
Q. Mr. McGhee, the vehicle that crossed the center line, it in fact, passed your vehicle and went on down the road, didn't it?
A. Sir, in my opinion, uh, it did.
Q. That's based on the fact that you, when you first saw it cross the center line, the distance when you first saw it cross the center line; is that correct?
A. In my opinion, yes, sir."
In a later part of his testimony at trial, Louis McGhee stated:
"[T]here was no way the car that came in our, our lane could have been the one that hit us because if it had hit us, it would have hit us from the left side. And, the car that we hit was on the right rear of our car. And, there's, you know, there's no way I don't think that we could have hit that car."
Thus, of the three eyewitnesses to the accident, not one testified that the Edwards vehicle was the one which crossed into the northbound lane causing Ollie McGhee to take evasive action. On the contrary, both Edwards and Mr. McGhee testified positively that the Edwards vehicle did not cross into the wrong lane, and Mrs. McGhee testified somewhat evasively that she was not sure. However, in analyzing Mrs. McGhee's testimony, it is apparent she remembered the car which swerved into her lane was so close she had to swerve to the right to avoid striking it in the northbound lane, which she was successful in doing.
The two state troopers who investigated the accident found 75 feet of "scuff" marks left by the tires of the McGhee vehicle as it slid sideways from the east shoulder to the point of impact in the southbound lane. Of. these 75 feet of tire marks, 12 feet were in the northbound lane and 63 feet in the southbound lane. As stated above, the troopers found the point of impact was in the southbound lane approximately 6 feet west of the center line. The troopers also found that the right front of the Edwards vehicle struck the right rear of the McGhee vehicle. These physical findings are easily reconciled to the theory that the vehicle which crossed into the northbound lane was not the Edwards vehicle but was another vehicle which was so close to Mrs. McGhee that she had to swerve onto the shoulder to avoid striking it, but then lost control and skidded sideways into the southbound lane where she struck the Edwards vehicle. As Mr. and Mrs. McGhee both testified the vehicle which crossed into their lane was very close to them at the time. The time and distance for Mrs. McGhee to swerve to the right onto the shoulder where she must have gone for a short distance and then come back onto the highway and skid sideways a distance of 75 feet to the point of impact, simply cannot be reconciled with the theory that it was the Edwards vehicle which crossed into the northbound lane.
Plaintiff introduced the testimony of Prof. Joseph Barnwell, an expert in accident reconstruction, who gave calculations as to the speeds of the vehicles, the reaction time of Mrs. McGhee and the distance which she must have traveled on the shoulder and the tire marks showing she skidded at least 75 feet on the highway. As counsel for Edwards points out in his brief, if we use Dr. Barnwell's calculations the McGhee vehicle was 150 feet south of the point of impact 2½ seconds before the collision. *1177 With the vehicles closing on each other at speeds of at least 45 miles per hour, it would have been impossible for the vehicles to have collided within 2½ seconds. The Edwards and McGhee vehicles would have had to have been 300 to 400 feet apart when Mrs. McGhee started her evasive action. After carefully analyzing Dr. Barnwell's theory, we reach the conclusion that it simply is unacceptable. It is contrary to the testimony of the eyewitnesses and to the physical evidence.
The only other evidence on which plaintiff can possibly rely to support the position that it was the Edwards vehicle which came into the northbound lane, is the testimony of Edwards himself that he does not remember a vehicle proceeding in a southerly direction in front of him. We do not find this negative testimony sufficient to overcome the positive eyewitness testimony or the physical findings of the state troopers.
We conclude it was not the Edwards vehicle which crossed the centerline into the northbound lane of travel. There is no other theory on which Edwards could have been negligent. There is no evidence that he was speeding or that he was failing to keep a proper lookout. We conclude the jury was clearly wrong in finding Edwards at fault.

FAULT OF OLLIE MCGHEE
The next issue is whether the jury was clearly wrong in finding Ollie McGhee at fault. We start with the well established rule that when a collision occurs between two vehicles, one of which is in the wrong lane of travel, there is a presumption that the driver in the wrong lane is negligent, and the burden is on him to exculpate himself from any fault, however slight, contributing to the accident. Delrie v. Transport Insurance Company, 413 So.2d 356 (La.App. 3d Cir.1982). Since the collision occurred in the wrong lane of travel for Mrs. McGhee, she has the burden of exculpating herself from any fault whatever. Mrs. McGhee's defense is based on the sudden emergency doctrine which is that one who suddenly finds himself in a position of peril, not of his own making, and without sufficient time to fully consider all of the circumstances or the best means of avoiding the danger, is not guilty of negligence if he fails to follow what subsequently may appear to have been a better method. Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (La.1972).
Under this rule, counsel for Mrs. McGhee argues the evidence shows she was driving within the posted speed limit of 55 miles per hour, and was suddenly confronted with an unidentified oncoming vehicle invading her northbound lane of travel at a distance of 4 to 5 car lengths. She took evasive action by swerving onto the right shoulder which was graveled and wet, causing her to lose control and spin in a counterclockwise direction as she skidded sideways a distance of 75 feet from the east shoulder to the southbound lane of travel where the collision occurred.
On the other hand, plaintiff argues there was sufficient evidence to support a conclusion by the jury that Mrs. McGhee was at fault in failing to maintain a proper lookout and to take reasonable evasive actions sooner than she did, in failing to maintain proper control of her vehicle after she went onto the shoulder and in losing control and crossing the centerline of the highway where she struck the Edwards vehicle.
Our conclusion is there was insufficient evidence to show that Mrs. McGhee failed to maintain a proper lookout as to the vehicle which invaded her lane of travel. The only evidence on this issue is the testimony of Mrs. McGhee and her husband. She said the vehicle was very close and she had to swerve onto the shoulder to avoid striking it in her lane. Louis McGhee testified the invading vehicle was only 4 or 5 car lengths ahead when it swerved into their lane. However, under the facts as we have found them it was not this invading vehicle which Mrs. McGhee struck. It was the Edwards vehicle which was some distance behind the invading vehicle. The *1178 jury could have reasonably concluded that after she drove onto the shoulder she failed to keep a proper lookout as to the oncoming Edwards vehicle and, instead, overreacted by turning immediately back onto the highway and losing control of her vehicle, instead of continuing along the shoulder until she slowed sufficiently for safety. Although Mrs. McGhee's sudden emergency defense presents a close factual issue, we conclude the jury was not clearly wrong in finding her negligent.

FAULT OF THE DEPARTMENT OF TRANSPORTATION
The next issue is whether the trial judge was clearly wrong in finding as a fact that there was no fault on the part of the Department of Transportation and Development. In written reasons dictated into the record after the jury verdict was read, the trial judge found that plaintiff had not proved, by a preponderance of the evidence, that a hazardous condition existed on the shoulder or on the highway itself. In particular, the trial judge stated a preponderance of the evidence showed that the travel lanes of the highway and both shoulders were in good condition and well maintained, and that there was no defect.
Plaintiff contends the trial judge was clearly wrong. She urges the evidence shows there was a "drop-off" of from 2 to 5 inches from the asphalt surface of the highway to the graveled shoulder, and that this is what caused her to lose control when she drove onto the shoulder and attempted to steer back onto the highway.
Both Mrs. and Mr. McGhee testified they "felt" their car go onto the shoulder. Neither ever saw the shoulder. Plaintiff's expert witness, Prof. Joseph Barnwell, testified he visited the scene about 5 weeks after the accident and that he saw in various places drop-offs of 2 to 3 inches from the blacktopped surface to the graveled shoulder. Barnwell expressed the opinion that in wet weather such a condition was hazardous and could have caused Mrs. McGhee to lose control. Plaintiff also introduced the testimony of Kenneth Hazelton, a truck driver, who often drove along this highway, and who also, incidentally, was an auxiliary member of the police department of the City of Bunkie and was called to the scene on the night of this accident. He stated that he had often hauled soybeans along this highway and had noticed the low shoulders with "stepoffs" of 2 to 5 inches. Mr. Hazelton's wife, Delores Hazelton, also testified that she lives in Bunkie and that her parents live on Highway 71 where she was raised, and that she had noticed the "step-offs" on the shoulder in that area. Neither Mr. nor Mrs. Hazelton knew the exact location where Mrs. McGhee went off onto the shoulder. Their testimony was general. Both Mr. and Mrs. Hazelton testified over objections by the State that these were surprise witnesses whose names were not listed in advance of trial, and whom the State had not had an opportunity to depose. Counsel for plaintiff explained that he had not discovered these witnesses until a day or two before trial, so the court permitted them to testify.
One of plaintiff's own witnesses was State Trooper Jeffery Bordelon, who arrived at the scene about one-half hour after the accident and was in charge of the investigation. His testimony shows he and Trooper Manuel made a detailed examination of the scene. They found the 75 feet of "scuff marks," which Bordelon said were actually tire marks, left by the McGhee vehicle as it slid sideways from the northbound to the southbound lane of travel. Bordelon testified that using the headlights of the patrol car, driven by Manuel, and a flashlight carried by Bordelon, he walked along and closely examined the east shoulder of the highway for a distance of at least 300 feet south of the scuff marks, and that he found no defects and no difference in elevation. Trooper Bordelon took pictures which he says showed no defect or elevation difference between the shoulder and the highway.
Thus, plaintiff relies on the testimony of Mrs. and Mr. McGhee who "felt" their car go onto the shoulder, of Dr. Barnwell, *1179 who visited the scene 5 weeks after the accident, and that of Mr. and Mrs. Hazelton whose testimony was very general. The State relies on the testimony of Trooper Bordelon who was on the scene the night of the accident and examined the shoulder specifically for defects and found none. We cannot hold the trial judge was clearly wrong in giving greater weight to the testimony of Trooper Bordelon than to that given by plaintiff's other witnesses.

EVIDENCE OF PLAINTIFF'S REMARRIAGE
The next issue is whether the trial judge erred in refusing to allow the defendants to cross-examine Mrs. Bishop and her witnesses as to her remarriage and her emotional condition following the death of her husband. Defendants concede the general rule is that evidence of remarriage of a widow is inadmissible for the purpose of mitigating damage in an action for wrongful death of her husband. McFarland v. Illinois Central R.R. Company, 241 La. 15, 127 So.2d 183 (La.1961); Whittington v. Sowela Technical Institute, 438 So.2d 236 (La.App. 3d Cir.1983), writs denied, 443 So.2d 591, 592 (La.1983). However, defendants argue this general rule does not apply where a widow seeks at the trial to introduce evidence of her continuing emotional problems as an element of her general damage award. Defendants cite a Federal Court of Appeal case, Caldarera v. Eastern Airlines, Inc., 705 F.2d 778 (5th Cir.1983) for its holding that once the widow opens the door to evidence of her emotional state at the time of trial, the defense should be permitted to introduce in rebuttal evidence of her remarriage and improved emotional condition. Defendants in the present case argue that the exclusion of the evidence was erroneous and the case should be remanded for another trial.
We notice that the jury awarded $12,500 for loss of love, companionship and society of plaintiff's deceased husband and in addition awarded $12,500 for "grief, mental anguish and suffering," a total of $25,000 for these two items of damages which are actually very similar. Even if the evidence as to remarriage was improperly excluded by the trial judge, we deem it appropriate in the present case to exercise our discretion to evaluate all of the evidence in the case and determine whether this portion of the jury verdict was such that the case should be remanded. It is our view that the award was certainly not excessive even if the evidence of the remarriage had been admitted. Therefore, in the interest of judicial economy we deny the request for a remand and affirm this portion of the jury award. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975); Starts v. Kelley, 435 So.2d 552 (La.App. 1st Cir.1983).

JURY REVIEW OF INSURANCE POLICIES
The next issue urged by the defense is that the trial court erred in refusing to allow review by the jury of the limits of coverage in the insurance policies introduced into evidence by defendants. At the trial, defendants introduced into evidence a certified copy of the State Farm Mutual Automobile Insurance Company policy providing automobile liability on the McGhee vehicle with applicable limits of $20,000 and a copy of the Shelter Insurance Company policy covering the liability of Eunice Edwards with applicable limits of $19,000. Defendants requested the jury be allowed to examine these policies, including the limits of coverage. The trial judge refused to allow the jury to see the policies. On appeal, counsel for Eunice Edwards and Shelter Insurance Company complain this was error.
Counsel for Shelter points out that confusion in our jurisprudence apparently started with Ashley v. Nissan Motor Corp. in U.S.A., 321 So.2d 868 (La.App. 1st Cir. 1975), writ denied, 323 So.2d 478 (La.1975) where a majority of the 3-judge panel of the Court of Appeal affirmed the trial court ruling which refused to allow the jury to see the policy limits. The rationale of the majority was that large policy limits would violate the rule against showing defendant's *1180 wealth or ability to pay a large judgment and although evidence is permitted to show defendant's inability to pay, there is no logical reason to reveal to the jury large policy limits and withhold small ones. Judge Yelverton dissented, being of the opinion that where insurance policies are introduced into evidence the jury should be allowed to examine them and to see the policy limits. The Supreme Court denied writs, 323 So.2d 478, stating:
"Although we do not approve that portion of the opinion which permitted the policy limits to be withheld from the trial jury, we cannot say that under the facts the result is incorrect."
In Courville v. State Farm Mutual Automobile Insurance Company, 386 So.2d 176 (La.App. 3d Cir.1980), reversed in part, 393 So.2d 703 (La.1981), the opinion states if insurance policies are introduced as evidence they may be exhibited to the jury. The Fourth Circuit Court of Appeal apparently takes a contrary view in Briscoe v. Stewart, 423 So.2d 1198 (La.App. 4th Cir.1982), writ denied, 432 So.2d 266 (La. 1983), where the court holds it is error to inform the jury of insurance limits, not only because it is irrelevant but also because it could be prejudicial to the jury's impartial determination of the amount of damages.
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), counsel for plaintiff and for defendant had stipulated the insurance coverage and its limits. The trial court refused to inform the jury about the contents of this stipulation. The Supreme Court held this was error, stating: "In a jury trial, the jury is entitled to know all the evidence. We know of no statute or jurisprudence which, in the absence of agreement of the litigants, would permit admissible evidence to be withheld from the jury."
In Domingue v. Continental Insurance Company, 348 So.2d 209 (La.App. 3d Cir. 1977), the issue was fully discussed and a majority of the panel held, with the author of the present opinion dissenting, that policy limits may go to the jury.
From the above brief discussion of the jurisprudence, it would appear that our Supreme Court has indicated in both Arceneaux and in the writ denial in Ashley that the jury may be informed of insurance policy limits. The Third Circuit has also held to this effect. In the absence of an opinion with a full discussion of the issue by our Supreme Court, there is certainly room for argument on both sides. However, what we do have from the Supreme Court indicates it prefers to let the jury see the policy limits, and the Third Circuit has so held. Therefore, we find it was error for the trial judge to refuse to allow the jury to see the policy limits.
Although we conclude the trial judge erred in failing to allow the jury to see the policy limits, the error was not prejudicial in the present case. The apparent purpose of the request of counsel for Eunice Edwards and Ollie McGhee that the jury see the policy limits was to inform the jury that these two individual defendants had relatively small liability insurance coverage in comparison with the award which the jury was likely to make. Our discussion hereinafter of the items of the award shows the awards were very reasonable and, if anything, were low. This error by the trial judge is not sufficient to warrant reversal or a remand for a new trial.

JURY INTERROGATORIES ITEMIZING DAMAGES
Counsel for Ollie McGhee and State Farm argues it was "grossly prejudicial" for the trial judge to submit to the jury interrogatories on 12 separate items of damages. These interrogatories and the amounts awarded by the jury are as follows:

"a) Pain and suffering of her
 deceased husband prior to
 his death ........................ $20,000.00
b) Loss of past support of
 her deceased husband .............. 29,000.00
c) Loss of future support of
 her deceased husband .............. 350,000.00
d) Loss of love, companionship
 and society of her deceased
 husband ........................... 12,500.00

*1181
e) Grief, mental anguish and
 suffering ......................... 12,500.00
f) Funeral bill ...................... 4,000.00
g) Past pain and suffering of
 Peggy Gruber Bishop ............... 22,000.00
h) Future pain and suffering
 of Peggy Gruber Bishop ............ 7,500.00
i) Physical disability and/or
 impairment of Peggy Gruber
 Bishop ........................... 16,000.00
j) Past medical expenses ............ 1,100.00
k) Future medical expenses .......... 600.00
l) Impairment of earning capacity ... 2,400.00
 ___________
 TOTAL ............................ $477,600.00

Defendant argues as to Item (a) that there is no evidence plaintiff's husband suffered any pain between the time of the accident and his death. There is a factual dispute in this regard, so it was certainly appropriate for the trial judge to include this interrogatory. As to Items (d) and (e), defendant argues these are duplicative in that they are both for damages for loss of love, companionship and mental anguish due to her husband's death. As stated above, the jury awarded only $12,500 for each of these items, a total of $25,000, which is not excessive even if they are duplicative. We find no prejudice in this regard. Finally, defendant argues that over-all, the listing of 12 separate items of damages was prejudicial. LSA-C.C.P. arts. 1812 and 1813 expressly provide in essence that the court may submit to the jury, together with appropriate forms, written interrogatories on any of the factual issues in the case. Much discretion is allowed the trial judge in this regard. Scheer v. Pat O'Briens's Bar, Inc., 404 So.2d 292 (La.App. 4th Cir.1981). There was certainly no abuse of the trial court's discretion in this case. The interrogatories as to the items of damages appear to be reasonably required for the jury to decide the awards.

COURT'S FAILURE TO SUBMIT TO THE JURY INTERROGATORY AS TO ANY FAULT OF THE DEPARTMENT OF TRANSPORTATION
Counsel for Mrs. McGhee and State Farm also contends they were prejudiced by the failure of the trial court to submit to the jury interrogatories regarding the degree of fault of the Department of Transportation and Development and the degree of fault of the unidentified motorist who invaded Mrs. McGhee's lane of travel. We find in the record (Tr. pgs. 706-707) that counsel for the plaintiff timely objected to the lack of a jury interrogatory as to the State's negligence and the percentage thereof, but we find no objection by counsel for the defendants in this regard. Moreover, we find no objection in the record by any counsel as to the lack of a jury interrogatory directed at the negligence of the unidentified motorist who invaded Mrs. McGhee's lane of travel. Of course, it is well established that failure to timely object to jury instructions before the case goes to the jury for decision constitutes a waiver of any objections to the charges or the interrogatories. Ryals v. Home Insurance Company, 410 So.2d 827 (La.App. 3d Cir.1982), writ denied, 414 So.2d 375, 376 (La.1982). Thus, by their failure to timely object, counsel for defendants have waived their right to raise this issue on appeal. Counsel for the plaintiff did object timely and can raise the issue.
From his argument made at the time of his objection during the trial, it is apparent counsel for the plaintiff understood the serious problems presented in this bifurcated trial where comparative negligence was also at issue. The problem has probably been answered by Act No. 534 of 1983 amending LSA-C.C.P. art. 1812 so as to permit the court to require special verdicts in the following situation:
"(2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage."
By coincidence, Act No. 534 of 1983 did not become effective until August 30, 1983, *1182 which was one day after the present trial started on August 29, 1983. Under this amendment, the trial judge could have directed interrogatories to the jury as to the fault of the Department of Transportation and the degree thereof and also as to any fault of the unidentified motorist and the degree thereof.
After considering all of these factors, we conclude that in the present case there was actually no prejudice to either the plaintiffs or the defendants caused by the lack of a special jury interrogatory as to any fault on the part of the State or the unidentified motorist and the degree of such fault. The judge's charge made it clear to the jury that they could find one or both of the individual defendants negligent and assess a percentage to one or both, so long as the percentage did not exceed 100%. The judge also explained to the jury that he would decide whether the State was negligent. What the jury actually did was to conclude that the State was guilty of fault in the degree of 60%, and that Edwards was guilty of fault in the degree of 10% and Mrs. McGhee 30%. Even if the judge had submitted to the jury special interrogatories requiring the jury to decide whether the State was negligent and the degree thereof, their decision would have been the same. Of course, as explained above, although the jury as a practical matter decided the State was guilty of fault to the degree of 60%, this finding by the jury has no legal effect because it had no right to make this decision.
Our conclusion is that even if it was error for the trial judge to fail to submit to the jury an interrogatory as to the fault of the State and the degree thereof, such error is not grounds for reversal.

FAILURE TO GIVE CERTAIN JURY INSTRUCTIONS REQUESTED BY THE PLAINTIFF
Plaintiff complains on appeal of the trial judge's failure to give certain jury instructions regarding traffic laws, evidence of prior convictions on traffic charges, the award of damages, and awards for pain, suffering, and mental anguish, past and future. We have carefully examined all of these requested charges which were not given and find they were adequately covered by the judge's charge as a whole.

EXCESSIVENESS OF THE AWARDS
Defendants contend certain items of the award were either excessive or duplicative. The itemized awards are set forth above. Defendants first argue the award of $20,000 for the pain and suffering of the decedent prior to his death is not supported by the evidence. The decedent was thrown from the Pontiac automobile and suffered a broken neck and a basal skull fracture. Plaintiff testified her husband made "gurgling sounds," but there is no evidence that he spoke to anyone or opened his eyes or was conscious. He was pronounced dead on arrival at the Bunkie General Hospital at 3:17 a.m., which was approximately 1 hour after the accident. We have examined the cases cited by defendants where smaller awards were given for apparently comparable pain and suffering prior to death, but we do not find the award in this case is an abuse of the much discretion of the jury as to awards of damages for personal injuries and death.
Defendants also complain of the jury's award of $29,000 for loss of past support and $350,000 for loss of future support to plaintiff because of the death of her husband. The principal argument in this regard appears to be that plaintiff's expert economist, Dr. Culbertson, did not take into account any deduction required for the decedent's own personal expenses, which Dr. Culbertson admitted on cross-examination could be as much as 40% of the decedent's income. Defendants cite Roundtree v. Technical Welding & Fabrication Company, Inc., 364 So.2d 1325 (La.App. 4th Cir. 1978), writ denied, 367 So.2d 389 (La.1979), where the decedent was a welder earning $12,610 annually and the economist calculated the loss of future support of the widow at $108,830. The Court of Appeal amended the judgment so as to allow a *1183 discount of 20% for the personal living expenses of the decedent. See also Jones v. Kansas City Southern Railway Company, 143 La. 307, 78 So. 568 (La.1918); Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir.1976), writs denied, 341 So.2d 1129, 1130 (La.1977); and Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La.App. 4th Cir.1978), writ denied, 365 So.2d 242 (La.1978), where the decedent's personal expenses were considered as a factor in determining loss of future support of the widow.
In the present case, the decedent's earnings as a high school football coach were $17,960 in 1981 and would have been $18,632 in 1982. Dr. Culbertson used a lifework expectancy of 30.2 years, a 6% wage increase per year and he discounted this 10½%, arriving at a net loss of earnings of $321,367. No discount was made by Dr. Culbertson for the personal living expenses of the decedent. As shown above, the jury awarded $350,000 for loss of future support of the plaintiff.
We conclude the jury abused its much discretion in awarding $350,000 for loss of future support. This is not only more than Dr. Culbertson's total figure of $321,367, but it obviously fails to allow any deduction whatever for the decedent's personal expenses during his expected lifework expectancy of 30.2 years. Although Dr. Culbertson expressed the opinion the decedent's personal expenses could amount to as much as 40% of his income, we conclude the lowest discount which the jury could have reasonably calculated is 20%. Accordingly, we will use Dr. Culbertson's figure of $321,367 and discount that by 20%, resulting in an award of $257,094 for loss of future support.
Defendants also argue the award of $29,000 for loss of past support should likewise be discounted for the living expenses of the decedent. We agree. Accordingly, the award for loss of past support will be reduced to $23,200.
Defendants also complain of the award of $29,500 to plaintiff for her past and future pain and suffering. At the time of the accident, plaintiff was also thrown from the Pontiac. She was taken that night to the Bunkie General Hospital where she was treated for general bruises and contusions of the face, nose and right leg. The following day she was taken to Rapides General Hospital in Alexandria where she was diagnosed as having bruises and contusions of the face and possibly a broken nose and also a badly bruised and swollen right knee. She was discharged from Rapides General the next day with instructions to consult her personal physician. She next was seen by physicians in Little Rock, Arkansas, the home of her parents. It developed that her most serious injury was a tear of the medial meniscus of the right knee. The injury was surgically examined on January 29, 1982, but no surgical repair of the meniscus was found necessary. It healed normally and by March 16, 1982, her physician in Little Rock released her to return to work. Plaintiff testified she did return to work, but continues to have pain on occasion.
Under these facts, we find no abuse of the jury's much discretion as to the award of $29,500 for past and future pain and suffering.
Defendants also complain of the award of $16,000 for plaintiff's physical disability and/or impairment. Under the facts of her injury generally discussed above, we find no abuse of discretion by the jury as to this award.
Defendants also object to the award of $600 to plaintiff for future medical expenses. Under plaintiff's testimony that she continued to have pain and some impairment of use of her knee, the jury could have reasonably concluded that some future medical expenses will be necessary. We find no abuse of discretion as to this award.
Finally, defendants complain that the award of $12,500 for loss of love, companionship and society of her deceased husband is a duplication of the award of $12,500 for grief, mental anguish, and suffering. We have discussed these awards above and have already concluded that the *1184 total of $25,000 for these two awards is not excessive even if they are duplicative.

DECREE
For the reasons assigned, the judgment appealed is amended in the following respects:
(1) The judgment in favor of Peggy Gruber Bishop and against defendants, Eunice Edwards, and his insurer, Shelter Insurance Company, is reversed and set aside and plaintiff's suit against these two defendants is dismissed with prejudice;
(2) The judgment in favor of Peggy Gruber Bishop and against Ollie McGhee and her insurer, State Farm Mutual Automobile Insurance Company, is reduced from the sum of $477,600 to the sum of $407,527;
(3) The assessment of 25% of the costs in the trial court against Shelter Insurance Company is reversed and set aside, and all costs in the trial court are assessed against Ollie McGhee and State Farm Mutual Automobile Insurance Company.
Otherwise than as herein amended, the judgment appealed is affirmed. All costs of this appeal are assessed against Ollie McGhee and State Farm Mutual Automobile Insurance Company.
AFFIRMED, AS AMENDED.