601 So.2d 712 (1992)
AMERICAN CASUALTY COMPANY
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, et al.
Harry J. ROBERTS, III, et al.
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, et al.
Nos. 91-CA-922, 91-CA-924.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 1992.
Writ Denied September 25, 1992.
*713 David S. Kelly, Dwight C. Paulsen, III, Lemle & Kelleher, New Orleans, R.O. Lewis, Luling, Michael R. Sistrunk, Metairie, for defendants-appellees.
Robert M. Becnel, Daniel E. Becnel, Jr., LaPlace, for plaintiffs-appellants.
Before BOWES, GRISBAUM, and WICKER, JJ.
WICKER, Judge.
Harry J. Roberts, III and his wife Diana appeal judgments rendered in their favor against Illinois Central Gulf Railroad Company, the Parish of St. Charles, and their respective insurers. The issues are the applicability of the manifest error standard, the apportionment of fault, and the adequacy of the damage award. We modify and, as modified, affirm and render.
Mr. Roberts while driving his car collided with a train at a railroad crossing. He and his wife sued Illinois Central Gulf Railroad Company (Illinois Central Railroad Company); Wayne A. Conner, the engineer; the Parish of St. Charles; B & K Contractors a/k/a B & K Construction Company (B & K Construction Company, Inc.); and Hill Heights Country Club. Celtic Life Insurance Company, the Roberts' health insurer, intervened for the amounts paid on Mr. Roberts' medical bills. St. Charles Parish third-partied Titan Indemnity Company (Titan Holding Syndicate, Inc.), its insurer. In a consolidated case, filed ten days after the Roberts' petition for damages, American Casualty Company, the Roberts' automobile insurer, filed suit against the same defendants for reimbursement of the property damages.
B & K was dismissed with prejudice on joint motion; Hill Heights was dismissed on its motion for summary judgment; and Celtic, the intervenor, has been paid and the docket satisfied as to it. American's judgment in the consolidated case has also been satisfied. Titan denied coverage, and that issue was severed and is still pending. A notice of appeal was inadvertently issued in the consolidated case, although American did not appeal the judgment in that case. Consequently, we dismiss any purported appeal by American Casualty Company. The only parties to this appeal are Mr. and Mrs. Roberts, Illinois Central, Mr. Conner, and the Parish of St. Charles.
The four-day trial was bifurcated in that a jury determined the outcome between Mr. Roberts and Illinois Central and the judge ruled with regard to the Parish, although both proceedings went on simultaneously. The resulting findings conflict: The jury found Mr. Roberts to be 46% at fault, the Parish 31%, and Illinois Central 23%. It awarded Mr. Roberts $60,000.00 for his general and $40,000.00 for his special damages; and it awarded Mrs. Roberts $5,000.00 for loss of consortium. The judge, on the other hand, found Mr. Roberts 65% at fault and the Parish 10% at fault, leaving 25% unassigned. She awarded Mr. Roberts $150,000.00 in general and $30,000.00 in special damages, while awarding Mrs. Roberts $25,000.00 for loss of consortium. The resulting judgment awarded Mr. Roberts $23,000.00 and Mrs. *714 Roberts $1,150.00 against Illinois Central and Mr. Roberts $18,000.00 and Mrs. Roberts $2,500.00 against the Parish. The judge dismissed all claims against Mr. Conner, consistent with the jury findings of no negligence on his part. In allocating costs, the judge averaged her and the jury's allocations of negligence. The Roberts filed a motion for additur, which was denied.
The Roberts have appealed, arguing that (1) because of the inconsistency in the judge and jury findings the manifest error standard does not apply, (2) we should either harmonize the conflicting findings or review the record and make an independent finding, (3) both the jury and the judge assigned too great a percentage of fault to Mr. Roberts, and (4) the damage awards are inadequate. Illinois Central and the Parish argue that the manifest error standard applies and the factual findings of the triers of fact are not clearly wrong, although the Parish complains the judge's award of damages is too high.
This accident happened on a warm, clear night, June 24, 1987. Mr. Roberts had been playing softball with his team at the Hill Heights Country Club ball field. Hill Heights had only one entrance, a public road which was maintained by the parish. This eighteen-foot-wide road had to cross over the railroad tracks, where it narrowed slightly, making it necessary for motorists to pay attention not to drop off the edge. The grade of the crossing was very steep, making it impossible for a driver to see if something was coming from the other side until he was right up on the crossing itself. The crossing was unlit, except for the nearby lights of the softball field; and it was completely unmarked and uncontrolled.
Mr. Roberts finished up his game and had a Coke. Then he got in his Blazer and started for the railroad crossing, which he had crossed earlier that evening and many evenings previously. He probably had his windows down but his air conditioner on. He approached the intersection going about five miles per hour. He did not stop but looked to his left, his right, and then ahead for oncoming cars. He saw neither train nor cars so continued into the crossing.
At the same time an engine was approaching from his left, with its headlight on and sounding its horn. It may or may not have been ringing its bell. The brakeman saw Mr. Roberts from the right-hand window of the cab where he was sitting and called out a warning to the engineer, who threw the engine and its six or seven cars into emergency stop. The emergency stop applied air brakes instantly to all wheels and in addition released sand on the wheels. Mr. Roberts ran into the train; and apparently his bumper caught on the engine which dragged the Blazer several yards before releasing it. The truck turned over and came to rest, with Mr. Roberts pinned in the cab. He had no recollection of anything from the time he started across the crossing until he woke up in the hospital several days later.
Mr. Roberts was pinned in the cab for about three hours until equipment could extricate him. A witness with some knowledge of first aid crawled in the truck with him to help stabilize him. He suffered a closed head injury, fractured bones around the left eye socket, a dislocated left hip, a fractured right wrist, and multiple lacerations. He has recovered very well from his physical injuries and is now earning at least as much as before his accident. However, he and Mrs. Roberts claim that the personality changes he suffered have led to the breakup of their marriage. They were legally separated at the time of the trial and planning to be divorced.
Mr. Roberts rests his claims against the parish on its failure to mark properly the crossing with warning signs and other control devices. He rests his claims against the railroad on the engineer's failure to sound his warning horn and bells the statutorily-required three hundred yards before the crossing.

STANDARD OF REVIEW
Mr. Roberts argues that the manifest error rule of Rosell v. ESCO, 549 So.2d 840 (La.1989), does not apply because of the conflict between the judge and jury verdicts. He cites the rule of law followed in the Third Circuit that "[i]n a bifurcated trial, where the jury and trial judge reach *715 conflicting findings of fact and there is an appeal, the manifest error rule is inapplicable and the court of appeal must decide which decision is more reasonable after a careful examination of the record." Succession of Theriot v. Southern Pacific, 560 So.2d 861, 866 (La.App.1990) writs denied 565 So.2d 451, 565 So.2d 453, 565 So.2d 454 (La.1990); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App.1987), writ denied 522 So.2d 562 (La.1988). The First Circuit, in Bunkie Bank & Trust v. Avoyelles Parish Pol., 347 So.2d 1305, 1308 (La.App.1977), noted its obligation to "harmonize any conflict in decisions by the jury and the judge." The Fourth Circuit, however, has ruled that it must make its "own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent." Geraci v. Louisiana DOTD, 589 So.2d 1215, 1217 (La.App.1991); Williams v. City of New Orleans, 433 So.2d 1129, 1137 (La. App.1983). All three circuits cite the same Supreme Court case as authority for these rulings, Thornton v. Moran, 343 So.2d 1065 (1977). That case instructed the court of appeal to "resolve the differences in the factual findings between the jury and the judge in these consolidated cases and to render a single opinion based upon the record." 343 So.2d at 1065.
Illinois Central urges us to apply the manifest error rule, arguing that the circumstances which led to the results in the above-cited cases do not apply here. For instance, they argue that the changes in the law of solidary liability effected by La.C.C. art. 2324, whereby "a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed", makes harmonization unnecessary. It also argues that the verdicts in question are not truly inconsistent such as would be the case if the judge had found one defendant one hundred percent at fault and the jury had found the other defendant one hundred percent at fault.
This is apparently a case of first impression in this circuit. Although we would not lightly set aside four days' work by a judge and jury, we do find a conflict between the results which requires reconciliation. We hold that the manifest error standard of review is inapplicable and we adopt as our own the method used in the Third Circuit. We will carefully examine the record and decide which decision, the judge's or the jury's, is more reasonable.

LIABILITY
Mr. Roberts' fault was assessed at forty-six percent and sixty-five percent respectively by the jury and judge. In both cases, the trier of fact assessed him a greater percentage of fault than either the railroad or the parish. The evidence supports the higher percentage found by the judge.
Mr. Roberts was not drunk or impaired in any way the night of the accident. The weather was clear and dry and not a factor. He was familiar with the crossing, having crossed it earlier in the evening and many times previously. He admitted he knew this was a train crossing but he did not stop. He looked to his left and then his right, but he never looked back to the left again before crossing the tracks. He said, "I did not see the train, that's the bottom line." He never heard the train whistle and concentrated his attention on looking ahead at oncoming cars. He concluded, "I know I was at fault." On cross-examination he said he couldn't remember whether he had his radio on but he thought, as per his usual practice, he had the windows open and the air conditioner on. He reiterated that he never heard the train whistle. Even his own expert concluded that Mr. Roberts should have seen the train; that if he felt he couldn't watch the crossing, the oncoming traffic, and the train all at once, he should have stopped.
Illinois Central's fault was assessed at twenty-three percent by the jury. The percentage of fault left unallotted by the judge, who was trying the case against the parish, was twenty-five percent. The jury assigned a thirty-one percent finding of fault to the parish, while the judge fixed the percentage at ten. We believe the *716 judge's conclusions to be the more reasonable.
Illinois Central's obligation stems from statute.
Every railroad company ... shall equip each locomotive engine with a bell and a whistle or horn which, under normal conditions, can be heard at a distance of three hundred yards and, upon engines approaching at grade any street or highway crossing, whether or not said crossing shall be otherwise protected, shall, for a distance of not less than three hundred yards and until the crossing is reached, cause either the bell to be sounded continuously or blasts of the whistle or horn to be sounded in the manner provided by the Uniform Code of Railroad Operating Rules....
R.S. 32:168. There was considerable variation in the various witnesses' testimony about whether and when the train started blowing its whistle. The engineer, brakeman, and conductor testified that the whistle started blowing, two long, one short, and one long blast, at least three hundred yards from the crossing. They knew this by a particular point of reference, a block signal seven or eight hundred feet before the crossing. When they saw Mr. Roberts, they started blowing a warning signal. Other drivers testified that they didn't hear the whistle but it could have blown. They had either windows up, air conditioners going, radios on, or some combination of these. The police report indicated that the whistle was blown fifty feet from the crossing. Another motorist heard a four or five-second blast when he was fifteen or twenty feet from the crossing but admitted it could have blown earlier but he just didn't hear it. He had windows closed, and radio and air conditioner on. A couple whose house was right by the tracks heard the whistle from one to two minutes before the collision. Another man, standing in the parking lot for the ball field, heard the train whistle when it was fifty or seventy-five yards away.
The railroad has no responsibility for the installation of most warning or traffic control devices such as whistle posts [posts three hundred yards prior to a crossing which let the engineer to start blowing the whistle], painted markings on the pavement, or stop signs. Installation and maintenance of signs and highway markings were the responsibility of the parish or, in the case of a state highway, the State of Louisiana. Active warning devices, such as train-activated gates, would have to be authorized and installed by the railroad but paid for by the parish. The experts were uncertain about responsibility for crossbucks [signs which warn of a railroad crossing]. The parish was responsible for maintaining the road itself, while Illinois Central was only responsible for the actual tracks and ties. However, at the time of this accident, the parish mistakenly assumed that the crossing was a private one for which it had no responsibility.
The crossing itself was established by most witnesses to be a difficult one. The asphalt road leading to the crossing varied in width from a maximum of about twenty-three feet to a minimum of a little more than eighteen feet, with the narrowest point the area of tracks and ties. There was something of a drop off at the edge of the ties. The grade of the crossing was steep, and a driver could not see an oncoming motorist on the other side unless it was night and he had his lights on.
The expert witnesses on liability, Ira Robert Erlich, Ph.D. for Mr. Roberts and Olin K. Dart, Jr., Ph.D. for Illinois Central, differed greatly in their opinions concerning the safety of this particular crossing.
Dr. Erlich, whose review of the evidence and actual inspection of the accident scene seems the more thorough, opined that the crossing was improperly marked because it lacked crossbucks, pavement markings, advance warning signs, and a whistle post. However, he also had erroneously assumed the accident took place during daylight. He found the crossing to be difficult and dangerous and violative of almost every standard. He felt both Illinois Central and the parish must have known the crossing was improperly marked and neither of them did anything. Dr. Erlich also criticized the design of the engine, since the brakeman was unable to apply the emergency brake himself without having to turn around and fumble for it. He considered *717 this to be a heavily-travelled crossing and, as such, worthy of a train-activated warning system. He admitted on cross-examination that if Mr. Roberts actually looked for the train and just didn't see it, then perhaps the lack of signs didn't play a part.
Dr. Dart reached his opinion without having examined the site, although he did do some measurements years later. He concluded that train-activated warning signals were not warranted because the traffic count was low, the speeds of trains and cars was not excessive, there was no history of prior accidents, and the sight lines were adequate to allow a motorist to see a train coming for a sufficiently safe distance. He also testified that the presence of passive warning devices, such as stop signs or pavement markings, would not give any additional information to someone who knows where the tracks are and is looking for a train. He found the road not unduly narrow, as the minimum lane width for minor highways is nine feet; with most cars six feet wide, there would be plenty of clearance for two cars to pass over the crossing at the same time. He did admit that the railroad should have made a feasibility study on warnings if the parish had requested some kind of warning device. [There was a letter in evidence from the parish to Illinois Central in 1967 inquiring about the possibility of having a crossing at this point and suggesting that crossing gates be furnished.] He felt if the parish had requested such devices, Illinois Central probably would have installed them.
We believe the judge's apportionment of fault among Mr. Roberts, the Parish, and by implication Illinois Central is the most reasonable. We affirm a finding of 65% to Mr. Roberts, 10% to the Parish and 25% to Illinois Central.

DAMAGES
Mr. Roberts had extensive injuries as a result of this accident. His most serious was a closed head injury with probable contusion of the brain. It left him in a coma or stupor for several days in the hospital. He also had a fractured left orbit which had to be surgically repaired with wires and a plate in his forehead, a dislocated left hip with consequent damage to the sciatic nerve, a fractured right wrist, and various bruises and lacerations. He spent almost three weeks in the hospital, part of it in intensive care. One year post injury, Mr. Roberts complained to his neurologist, Thor Borreson, M.D., of brief episodes of lightheadedness during the previous year. On his last exam, one year and two months post injury, he was clinically normal except for an absence of reflex in the left leg as a result of the sciatic injury. Although Mrs. Roberts had previously complained of changes in her husband's personality, Mr. Roberts advised his doctor that he had returned to normal. Dr. Borreson believed that Mr. Roberts was functioning at a satisfactory level and that any symptoms he was having were more probably than not related to the accident. The plastic surgeon who did the facial repair, Richard E. Sabatier, M.D., thought that Mr. Roberts had healed as well as could be expected and that no additional treatment would be beneficial or necessary. He did note the small possibility of future surgery to remove the plate or to correct a failed bone graft, but he believed there would more likely than not be no further problems. Mr. Roberts has also been discharged by his orthopedic surgeon, Frederick L. Keppel, M.D. He had reduced the dislocation in the hip and placed Mr. Roberts in traction with a pin through his leg, and he performed surgery on the fractured wrist using pins. Mr. Roberts is likely to develop arthritis in this wrist and already has changes suggestive of arthritis. Dr. Keppel assigned a twenty to twenty-five percent disability of the wrist and a twenty-five percent disability of the hip.
Mr. Roberts is self-employed and works on weighing systems for grain elevators and other businesses. He had started his business right before his accident and lost about $4,000.00 a month for the next six months. He complained most of changes in his personality which caused him to be quick-tempered and short of patience. Mrs. Roberts complained of this also, testifying that there seemed to be a violence in him that scared her. Both testified that these changes caused their marriage to *718 break up. They also complained of a decrease in their frequency of sex for a period following the accident. Mr. Roberts, who seemed to be quite stoic, still complained that his wrist was stiff in the winter, that he had to be careful of his hip, and that he had given up many sports activities. His uncontradicted medical expenses were $42,000.00.
This evidence resulted in a jury award to Mr. Roberts of $60,000.00 in general damages and $40,000.00 in special damages. The jury gave Mrs. Roberts $5,000.00 for her loss of consortium. The judge awarded Mr. Roberts $150,000.00 for his general and $30,000.00 for his special damages. Mrs. Roberts received $25,000.00. As we ruled earlier, the judge's findings are more reasonable.
Mr. Roberts had a loss in income of at least $20,000.00 and stipulated medical expenses of over $40,000.00. He had grievous injuries which caused lasting disability. His and Mrs. Roberts' marriage was affected, maybe ruined by the accident. An award to Mr. Roberts of $30,000.00 for his special and $150,000.00 for his general damages and to Mrs. Roberts of $25,000.00 for her damages is amply supported by the evidence.
We modify the judgment to incorporate the judge's findings. We render judgment in favor of Harry J. Roberts, III in the amount of $180,000.00 and in favor of Diana Roberts in the amount of $25,000.00 and against Illinois Central Gulf Railroad Company and the Parish of St. Charles. These awards shall be reduced by Mr. Roberts' proportional fault. Each party to this appeal must bear his or its own costs.
MODIFIED AND, AS MODIFIED, AFFIRMED AND RENDERED.