McDonald, j.
I «.This case involves a dispute between Hartec Corporation (Hartec), Consolidated Waterworks District No. 1 (Waterworks), and GSE Associates, Inc. (GSE) concern *378 ing the Terrebonne Parish Schriever Water Plant Expansion project (the project). Waterworks retained the services of GSE to provide professional architectural and engineering services for the project. Waterworks hired Hartec to construct the plant, for the sum of $4,950,000.00, according to the plans and specifications prepared by GSE.
On June 26, 2002, Hartec notified Waterworks by letter that it was terminating the contract, pursuant to section 15.5 of the general conditions of the contract, due to suspension of work in excess of 90 days on two critical areas of the project, namely the filter trough openings and the dismantled piping in the high service pits. On September 6, 2002, Hartec filed suit against Waterworks, GSE, and Continental Casualty Company, GSE’s insurer. Hartec asserted that Waterworks, upon the recommendation of GSE, had refused to pay for completed work in the form of labor and materials placed on the project, and that in addition to the sums due on the contract, Hartec had suffered substantial additional expenses as a result of the acts and omissions of the defendants. The alleged acts and omissions included negligent undertaking of the architectural and engineering services on the project, failure to adequately prepare the plans and specifications, failure to furnish additional instruction and clarifications, failure to timely and fairly process requests for payments, failure to timely and fairly process requests for extensions of time, and failure to timely and properly inspect areas of work.
In particular, Hartec asserted that it was damaged due to the following acts or omissions of defendants: the failure of Waterworks pumps which contributed to flooding of the project; failure to provide owner-furnished items; failure to provide the correct elevations on the raw water suction piping; failure to timely provide | ..¡electrical drawings; engaging in decision making which unjustly enriched Waterworks and GSE; engaging in speculative investigations that delayed, interfered with and finally caused loss of continuity of construction on the project; failure to make timely and reasonable decisions regarding necessary changes, which caused delays in completion of the project; failure to provide the correct elevations and proper drawings to avoid conflict of piping and concrete beams at corridor No. 1; failure to provide the correct elevations and proper drawings to avoid conflict of piping and electrical services and Pipe Pit C; failure to grant extensions of time, which accelerated the cost; failed to adequately provide for construction joints in the clearwell roof; failure to process change orders in a timely manner; failure to provide the correct elevations and proper drawings to avoid conflict of suction piping; and other acts of negligence and unjust enrichment to be shown at trial.
Hartec asserted that GSE breached its duty of care and skill owed to Hartec by failing to adequately prepare plans and specifications on behalf of Waterworks; failing to accept responsibility for design errors; and failing to objectively, timely and fairly make decisions regarding processing change orders, requests for payments and extensions of contract time. Further, Hartec asserted that as a result of GSE’s failure to perform its duties and obligations, Hartec was damaged and suffered costs and expenses to be shown at trial.
Waterworks filed a Third Party Demand against West American Insurance Company, the surety for Hartec, and a Reconven-tional Demand against Hartec and GSE, seeking damages for liquidated damages, excess completion costs, engineering fees and remediation costs.
*379 In accordance with La. R.S. 13:5105, a bifurcated trial was conducted with a jury deciding the issues concerning the nonpublic entities (Hartec’s claims against GSE) and a judge deciding the issues concerning the public entity (Hartec’s |4claims against Waterworks and Waterworks’ claims against Hartec and GSE). The statute prohibits a jury trial in suits against political subdivisions of the state, except where timely demand for a jury trial is made by the state, a state agency, or a plaintiff in a lawsuit against the state or state agency. La. R.S. 13:5105(A).
After a trial on the merits, the jury rendered a verdict in favor of Hartec and against GSE in the amount of $909,222.49, consisting of the unpaid contract balance, additional costs incurred, and delay damages. The jury also found that GSE was solely at fault and attributed no fault to Hartec. Having taken the Waterworks portion of the case under advisement, the trial judge issued a judgment on February 9, 2009, that is inconsistent with the jury verdict. He found in favor of Waterworks and against Hartec in the amount of $1,555,472.69, consisting of excess completion costs and nearly a half million dollars in liquidated damages, and dismissed Waterworks’ claims against GSE. The judgment, dated February 9, 2009, includes both verdicts. GSE filed a motion for new trial and judgment notwithstanding the verdict, which were denied. This situation points out the difficulty that can occur in bifurcated trials with a jury deciding part of the case and a judge deciding the rest. The judicial history of this situation is very well summarized and discussed by Benjamin David Jones in his excellent Loyola Law Review article.[1]
GSE and Continental appealed the portion of the judgment against them, but later requested that the appeal be dismissed because of a settlement with Har-tec. This appeal was dismissed on September 29, 2010. Hartec appealed the judgment against it, citing nine assignments of error:
1. The lower court erred in rejecting Hartec’s claims for the contract balance.
2. The lower court erred in rejecting Hartec’s claims for delay damages caused [5by the negligent action of CWWs[2] engineer, GSE.
3. The lower court erred in assessing liquidated damages against Hartec in the amount of $479,500.00.
4. The lower court erred in rejecting Hartec’s claims for extra compensation.
5. The lower court erred in finding that the costs to complete the Project, $1,492,637.16 were reasonably incurred and supported by the record.
6. The lower court erred in concluding that the plans and specifications prepared by GSE were adequate.
7. The lower court erred in disregarding the factual findings of the jury.
8. The lower court erred in assessing legal interest from the date of judicial demand.
9. The lower court erred in rejecting the surety defenses of waiver and overpayment and holding West American Insurance Company liable *380 for amounts in excess of the unpaid portions of the contract balance.
Before considering the merits of Har-tec’s appeal, it is necessary to determine the standard of review in a bifurcated trial.
BIFURCATION
In assignment number 7, Hartec suggests that the lower court erred in disregarding the factual findings of the jury and questions whether the jury’s decision to hold GSE liable is binding on the judge.
There are two instances in which bifurcated trials generally take place. The first instance is when the parties believe it is more time efficient to conduct separate trials on the issue of liability and/or causation, quantum, or insurance coverage.[3] Cases with large amounts of evidence and many witnesses may be tried more quickly, simply, and efficiently, if the issues of liability, causation, or insurance are separated from the evidence needed to prove damages. There is no | ^potential for conflicted rulings in this type of bifurcated trial. However, the second type can create problems for the courts. This type occurs when a portion of the trial is decided by a jury and the other by the judge, as in the case before us. This commonly occurs when the claims against a private defendant who has requested a jury trial are consolidated for trial with claims against a public entity, for which a jury trial is prohibited.[4] The problem occurs if the jury verdict and the judge’s verdict are inconsistent.
INCONSISTENT VERDICTS
Appellate courts have resolved the issue of conflicting verdicts in various and contrasting ways. Generally, there are two methods of analysis. The method adopted by the majority of the courts is to determine which of the verdicts is the most reasonable and adopt it. If one is clearly wrong, then the other is the most reasonable. If neither verdict is clearly wrong or manifestly erroneous, then the court will adopt the one that is the most reasonable. If both are clearly wrong, then the court must conduct a de novo review, just as it would if there were a single verdict that was clearly wrong. The other method, adopted by the Fourth Circuit Court of Appeal and by at least one panel of the Third Circuit, provides for a de novo review from the outset, with the appellate court substituting its judgment for that of the judge and jury.
METHODS TO RESOLVE CONFLICTING VERDICTS
In his law review article Benjamin David Jones has studied each court of appeal *381 circuit and chronicled the path each circuit has taken to resolve conflicting verdicts.
17First Circuit: The “more reasonable” standard
As Jones noted, in Thornton v. Moran, 348 So.2d 79, 81-82 (La.App. 1 Cir.1977), writs refused, 350 So.2d 897, 898, & writ denied, 350 So.2d 900 (La.1977), “[t]he court then defined a new standard, in which the reviewing court must ‘harmonize’ the judgment by ‘ascertain[ing] which of the triers of fact accorded á more reasonable measurement to the evidence in reaching a decision, and [deciding] which of the said triers of fact gave a more reasonable evaluation and drew a more reasonable inference from the facts.’ The more reasonable standard, therefore, grants a measure of deference to the findings of the judge and jury by forcing the appellate court to choose which of those findings is more reasonable. The court may not look elsewhere for a determination it considers to be the most reasonable. In applying this new standard, the Thornton II court found that the more reasonable finding was the jury’s conclusion that Moran was free from fault.”[5] However, prior to applying the “more reasonable” standard, the court should first make a determination that there is no manifest error in either verdict.[6]
Second Circuit: The “more reasonable” standard
In Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658, 665, the Second Circuit applied the Cornish manifest error standard, then the more reasonable standard. The court found that neither allocation of fault was manifestly erroneous, but that the judge’s allocation was more reasonable. As for damages, the court found that the jury’s awards for medical expenses, loss of future earnings, and lost earning capacity were manifestly erroneous; thus, it affirmed the judge’s awards. As for general damages and loss of consortium, the |8court found the judge’s award of general damages was more reasonable, and the jury’s award for loss of consortium was more reasonable.[7]
Third Circuit: The “more reasonable” standard and the de novo review standard
In Deville v. Town of Bunkie, 364 So.2d 1378 (La.App. 3 Cir.1978), writ denied, 366 So.2d 564 (La.1979), the Third Circuit adopted the “more reasonable” standard. This was the rule in the Third Circuit until July 12, 2006, when two panels of that circuit issued conflicting opinions. In McDaniel v. Carencro Lions Club, 2005-1013 (La.App. 3 Cir. 7/12/06), 934 So.2d 945, 959-960, writ denied, 2006-1998 (La.11/3/06), 940 So.2d 671, the court adopted a new approach to the “more reasonable” standard; in Hebert v. Rapides Parish Police Jury, 2005-471 (La.App. 3 Cir. 7/12/06), 934 So.2d 912, 920 reversed on other grounds, 2006-2001 (La.4/11/07), 974 So.2d 635, the court adopted the de novo standard. 56 Loy. L.Rev. 995, 1019.
As Jones explained, in McDaniel, “the [T]hird [C]ircuit attempted to conflate several approaches taken by the different courts into one workable standard. The court first stated its view that the term ‘harmonize’ must ‘require[ ] one judgment assessing fault percentages to all of the defendants that total 100%’. Accordingly, the court laid out its four-part standard, in which the first step is to consider the ‘trial *382 court’s finding of fault as to the public defendant under the manifest error standard.’ If those findings are not manifestly erroneous, then the appellate court should adopt them without considering the jury’s findings. However, if the findings of the trial court are manifestly erroneous, then the appellate court may conduct de novo review. Second, in deciding the findings of fault as to the other defendants, the court should again review both the trial court’s and the jury’s findings under the manifest error standard. If neither is 1 flmanifestly erroneous, then the court should choose the more reasonable finding. Third, if only one of the findings is manifestly erroneous, then the court should adopt the other finding. If the findings do not equal exactly 100%,- then the court must harmonize the verdicts, which could require adjusting the percentages of fault assigned to the private defendants. If both of the verdicts are manifestly erroneous, then the court must conduct a de novo review based on the record. Finally, in reviewing damages, if the court determines that neither finder of fact abused its discretion in awarding general damages and was not manifestly erroneous in awarding special damages, the court may choose the more reasonable award. If one is manifestly erroneous, the court should adopt the other award. If the court finds both fact-finders abused their discretion or were manifestly erroneous, then the court should conduct a de novo review ...”[8]
In Hebert v. Rapides Parish Police Jury, 934 So.2d at 918-920, the court “began by examining the confusion in its fellow circuits and concluded that, other than the fourth circuit, the standards of review used by the remaining circuits were too ‘cumbersome and unwieldy to survive objective application.’ The court, expressing its opinion that the more reasonable standard ignores the role of the fact-finder, found that the de novo standard was ‘the most practical and legally sound procedure susceptible of uniform application.’ ”[9]
Fourth Circuit: The de novo review standard
The “Fourth Circuit Court of Appeal has continuously held that the reviewing court should conduct an independent review of the record when analyzing conflicting results in a bifurcated trial.” 56 Loy. L.Rev. 995, 1022. See Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La.App. 4 Cir.1978). Jones further observed, that the court found “that the traditional function of the | incourt of appeal is to let the factual findings of the judge or jury stand as long as ‘the record contains credible evidence to support such findings.’ However, when the record does not contain such credible evidence, the decision of the trial court is set aside, and the appellate court may conduct an independent review of the record, without consideration of the findings of the original fact-finder. After discussing the peculiar nature of the function of the appellate court in reviewing inconsistent findings of a bifurcated trial, the court concluded that the proper standard is for the appellate court to conduct a de novo review.”[10] Even though categorized as a de novo standard of review, this sounds like an initial review for manifest error, and finding none, a de novo review, rather than a de novo review from the outset. There is no discussion of what the court should do if there is a finding of manifest error in either the jury or judge’s verdict.
*383 Fifth Circuit: The “more reasonable” standard
In American Casualty Co. v. Ill. Central Gulf R.R., 601 So.2d 712, 715 (La.App. 5 Cir.), writ denied, 604 So.2d 1005 (La.1992), the court found “the manifest error standard of review is inapplicable and we adopt as our own the [more reasonable standard]. We will carefully examine the record and decide which decision, the judge’s or the jury’s, is more reasonable.” [11]
In the case before us, Hartec sued Waterworks, GSE, and Continental Casualty Company, GSE’s insurer. Waterworks in turn filed a Reconventional Demand against Hartec and GSE and a Third Party Demand against Hartec’s surety. In each of the cases previously cited and decided by the various appellate courts there is a common thread: the parties are the same and, more importantly, the verdicts are against the same parties. The allocation of fault between the parties by the jury conflicts with the allocation of fault by the judge as to the same | T1 parties. The verdicts are so inconsistent that it is impossible to fashion a single judgment without harmonizing the conflicting verdicts.[12] That is not the situation |12in the *384 matter before us and we believe there is no need to reconcile the verdicts as each can be implemented regardless of the other. Not only can a single judgment be fashioned for each verdict, the court has done so. Even though the parties in the main demand and reconventional demand are the same, the verdicts by each separate trier of fact are not. The jury found in favor of Hartec and against GSE; the judge found in favor of Waterworks and against Hartec. Therefore, we are not called upon to decide which verdict is more reasonable than the other.
The jury verdict form is where much of the confusion in this case has arisen. Even though the jury was only trying Har-tec’s suit against GSE and Waterworks, interrogatories 7-11 pertain to the liability of GSE for elements of damage claimed by Waterworks against Hartec. The jury was asked to determine percentages of fault by GSE “in the event the judge determines that Hartec is liable to the Waterworks District” against Hartec. This was clearly an error since the judge had the responsibility to determine all aspects of liability and damages in the Waterworks reconventional demand against Hartec, GSE, and Hartec’s surety, West American Insurance Company. We also find that the verdict form contained an additional error. In interrogatory # 5 the jury was asked to determine the percentages of fault of only Hartec and GSE. The verdict form states that the total of the assigned percentages of fault should total 100%. The error was limiting the jury’s finding to only Hartec and GSE. The jury should have been able to determine any fault attributable to any additional entities.[13] (We *385 recognize that the only other potential negligent entity would have been Waterworks.)
| iSHowever, having found these errors we note that the jury verdict is not before us on appeal. The appeal by GSE has been dismissed. The only part of the judgment on appeal is the judgment in favor of Waterworks against Hartec. Even if we were to find that the jury verdict was clearly wrong or manifestly erroneous, it is no longer at issue in this appeal. Our inquiry focuses on the judge’s verdict. The judge deliberated for over eight months and gave 22 pages of written reasons for his judgment. In these reasons, he carefully analyzed the various claims, the testimony of the various witnesses including experts and the evidence that was presented. His findings are subject to the “manifest error” or “clearly wrong” standard of review. Under that rule, a court of appeal must not set aside the trial court’s factual findings unless (1) a reasonable factual basis does not exist in the record for the finding and (2) the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State of Louisiana, DOTD, 617 So.2d 880, 882 (La.1993). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility ofJ_ywitnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Having already addressed assignment of error number 7, we now address the remaining assignments in the order in which they were briefed by the appellant.
Assignments of Error No. 1 and No. 3: The lower court erred in rejecting Har-tee’s claims for the contract balance of $428,386.80 and the lower court erred in assessing liquidated damages against Har-tec in the amount of $479,500.00.
The contract provided for completion in 540 calendar days or until March 17, 2001. The district court found Waterworks was entitled to $479,500.00 in liquidated damages at the rate of $500 per day from March 18, 2001 through November 1, 2003, or 959 days. As the judge noted, “A major point of contention between the parties was GSE’s refusal to grant Hartec extensions of time to complete the project.” Article 12.2 of the contract provided:
12.2 The Contract Time will be extended in an amount equal to time lost due to delays beyond the control of CONTRACTOR if a claim is made therefor as provided in Paragraph 12.1. Such delays shall include, but not be limited *386 to, acts or neglect by OWNER or others performing additional Work as contemplated by Article 7, or to fires, floods, labor disputes, epidemics, abnormal weather conditions, or acts of God.
The court observed that Article 12.1 required Hartec to make a written request for an extension of time no later than 30 days after the occurrence of the event causing the delay. He found that many of the requests were well beyond the time limit. Additionally, the judge found that Hartec was the cause of some of the delays. The contract specifically refers to “abnormal weather conditions” not “adverse weather conditions” as argued by Hartec in its brief. “Abnormal” is not defined, however. Hartec submitted numerous requests for extensions due to rain. The court found the amounts of rain did not amount to an abnormal weather condition. This finding is not clearly wrong or manifestly erroneous.
There were two flood events that occurred, one on November 15, 2000, and one in June, 2001, as a result of Tropical Storm Allison. GSE contends that the |1swater receded quickly and only delayed construction by two days. Hartec also suggests that the actual problem was contamination from asphalt installed by a subcontractor that washed into the pit causing contamination to pipe that Hartec had installed. Hartec points out that the construction was basically being done in a pit or hole. After these rains, the water poured in damaging the valve actuators, electric motors that operate the valves. Over 30 actuators had to be replaced at a cost of over $2,300.00 each. Once the project was completed, these actuators were protected by the concrete walls that were poured. Several suggestions were made as to what Hartec could have done to prevent the damage to the actuators. These included building dikes around the site to prevent water intrusion, pouring the walls first before installing the actuators, and placing the actuators on stands or platforms. The actuators were supplied by the owners. The contract provided that Hartec was responsible for the care and storage and protection of products and equipment to prevent damage. The trial court found, at least after the first flooding, Hartec should have been on notice to do something to protect the site and equipment located there. The court also found that “under the clear terms of the contract and these circumstances, the risk of damage to these owner-supplied items was to be shouldered by Hartec. Further, in either case, no extension of time was due under the contract because the damage caused was not beyond the control of Hartec.” We cannot say that the trial court’s findings are clearly wrong.
Assignment of Error No. 4: The lower court erred in rejecting Hartec’s claim for extra compensation of $90,091.80.
Hartec sought compensation for additional work that was either outside the original contract or was caused by the actions of Waterworks and GSE. This included the following: RCP Elevational Clash — $1,038.40; Raw Water Pipe Rework — $28,126.09; Late Issuance of Electrical Drawings — $32,311.34; Electrical Duct Bank Remediation Work— $11,840.97; and Additional Roadway Repair — |$16,775.00.i(j In its written reasons the court addressed the electrical duct bank remediation and the electrical drawings. The underground duct bank serviced the old plant and was damaged by Hartec in the course of the construction. The judge found that the duct bank was shown on the plans and it was Hartec’s fault that it was damaged. The court also found that the parties knew and anticipated that the electrical drawings would not be provided at the beginning of the pro *387 ject, but would be forthcoming. The court found that “... submission of the wiring diagrams took place in plenty of time to allow Hartec to complete its installation work within the original contract time.” Evidently, the court also rejected the claim that the delay in providing these drawings caused any additional work or cost on Har-tec.
We find it was error for the trial court not to award extra compensation for the RCP elevational clash, the raw water pipe rework, and the additional roadway repair. The evidence indicates that the RCP elevational clash was not readily apparent without an extensive, miniscule examination of the plans. The repairs to the roadway were necessary because it was not constructed as represented. The plans indicated an 8-inch-thick concrete drive that turned out to be only 4 or 6 inches thick in places. The raw water pipe rework required Hartec to obtain a specially fabricated fitting in order to follow the plans. Therefore, the failure to provide this additional compensation to Hartec is reversed, and the $1,038.40, $16,775.00 and $28,126.09 for a total of $45,939.49 are awarded to them. We find no manifest error with the trial court’s failure to award extra compensation for the remaining claims of late issuance of electrical drawings and electrical duct bank remediation work.
Assignment of Error No. 2: The lower court erred in rejecting Hartec’s claims for delay damages caused by the negligent action of CWW’s engineer, GSE.
Hartec claims delays were caused by Waterworks and GSE, and it is due delay damages totaling $443,458.02. Hartec relies on the testimony of its expert, 117Robert Gregory, who was retained to testify specifically on this claim. He found Hartec was entitled to a total of 509 days of time extensions of which 443 days represented delays for which it was entitled to additional compensation. His opinion was based on the two floods and the consequences as a result thereof.
As previously noted, the trial court did not find Hartec was entitled to any additional contract extensions other than those that had already been allowed and rejected Hartec’s claims that resulted in assignments of error numbers 1 and 3. Since we have found no error in the court’s judgment awarding liquidated damages to Waterworks and rejecting Hartec’s claims for the contract balance, we find no error in the court’s rejection of Hartec’s claims for delay damages.
Assignments of Error No. 5 and No. 6: The lower court erred in finding that the costs to complete the Project, $1,492,637.16 were reasonably incurred and supported by the record and the lower court erred in concluding that the plans and specifications prepared by GSE were adequate.
Each side called various experts who had differing opinions, as would be expected. There were two main problems-concrete leaks and the installation of a rigid piping system. Concerning the concrete issues, the court commented:
The court received evidence from experts on both sides of this concrete leakage issue. The court understands that the issue is not about the “cracking” of the concrete, but about leakage of water from those cracks. Concrete structures of the kind at issue in this case will always crack. Design professionals like GSE are expected to draft plans and specifications in accordance with industry standards to minimize and control cracking so that leaks can be avoided. Contractors like Hartec are expected to follow those plans and specifications and complete the job in a workmanlike man *388 ner in accordance with construction standards.
Hartec’s expert in this regard, Dr. Raymond Avent, opined that the concrete leaks in this case were attributable solely to GSE’s failure to include contraction or expansion joints in its design. In his opinion, the concrete walls constructed by Hartec constituted monolithic structures of such length that design standards required the inclusion of contraction or expansion joints in the plans. He alleged that GSE’s failure to do so led to the massive cracks that resulted in the leakage about which the Waterworks District complained.
The Waterworks District’s expert Allison Launey, disagreed with Dr. Avent. He explained that the structures in question were not 11smonolithic structures as claimed by Dr. Avent. He explained that there were massive intersecting concrete walls eighteen to twenty inches wide constructed at intervals sufficient to diminish the length of each wall for purposes of determining the need for contraction or' expansion joints. Under applicable standards, contraction or expansion joints were not required. The inclusion of additional steel, or rebar, as called for by GSE’s plans and specifications, was sufficient compliance with industry standards to avoid the kinds of cracks that would have led to the leaks described in this case. Mr. Launey blamed Hartec’s construction methods for the concrete leaks at issue. He asserted that the leaking problems about which the Waterworks District complained and which he personally observed, were most likely caused by a combination of factors, including the folding over of waterstops installed in the concrete walls by Hartec in accordance with GSE’s requirements, voids in the concrete, and the existence of cold joints. According to Mr. Launey, all of these conditions were attributable to poor construction practices by Har-tec.
The folding over described by Mr. Launey occurred as a result of the improper pumping of concrete by Hartec, most likely from dropping concrete from a great distance above the waterstops. The voids in the concrete, called honeycombing, resulted from the failure of Hartec to adequately distribute the concrete throughout the concrete forms and rebar. The cold joints were the result of pouring wet concrete over sections of concrete that had already hardened. According to Mr. Launey, the physical evidence he observed at the construction site was consistent with these substandard construction practices.
Hartec’s project manager Steve Freeman, who was in charge of quality control for Hartec, denied Hartec’s personnel engage in these improper construction practices. However, he did admit that some honeycombing occurred, but that he never saw “any major water leaks.” He also acknowledged that he was not on the job site everyday
The court also received expert testimony from Joseph Wallwork and Frank Newell, both called by GSE. Mr. Wall-work confirmed the existence of cold joints and honeycombing in the concrete structures built by Hartec, and asserted that the leaks described in this case were beyond anything the Waterworks District should have expected. Both he and Mr. Newell found no deficiencies in GSE’s plans and specifications. Mr. Newell concurred with the opinion of Mr. Launey and blamed the concrete leaks on substandard construction practices by Hartec.
*389 The evidence in this case revealed that in 2006, about three and one-half years after Hartec left the Schriever waterplant site, Waterworks District personnel discovered a massive leak in an area known as the south wall. This exterior wall had a brick veneer. After the bricks were removed by the Waterworks District, a great deal of honeycombing was discovered in the wall. As explained by expert testimony, honeycombing exposes rebar, rebar rusts, and this decomposition and expansion of the rebar destroys the integrity of the 119surrounding concrete which can lead to leaks. The rebar at this location showed signs of rust. The inescapable conclusion is that honeycombing in this wall led to the deterioration of the concrete wall structure and the development of a subsequent leak. This event bolsters the evidence described above that improper construction techniques by Hartec led to the leaks in other parts of the water plant discovered in 2002. Although Hartec claims this leak was created by the removal of the brick veneer and mortar by Waterworks District employees during their investigation, this claim overlooks the fact that the leak was discovered before the brick veneer and mortar were removed.
Hartec has asserted that the evidence does not support a finding that it engaged in improper construction techniques because GSE inspectors monitored its concrete installation work and never complained. The court is satisfied that because of the means and methods selected by Hartec to perform the work, it would have been difficult, if not impossible, for GSE inspectors to discover the deficiencies that subsequently became apparent.
Folded waterstops, honeycombing, and cold joints are not design defects; they are evidence of improper and substandard construction techniques that lead to water leaks in concrete containment vessels. These leakage problems experienced at the Schriever waterplant expansion site were not the fault of GSE or the Waterworks District, but were the fault of Hartec.
The plans provided for a rigid piping system. Such a system has a very small tolerance for misalignment as opposed to a flexible system as was in use in the old plant. Keith Shackelford, a civil and mechanical engineer, testified on behalf of Hartec and criticized GSE’s rigid piping plan for its lack of mechanical joints or filler flanges. Ted Hicks, Chris Hicks, and Steve Freeman[14] also testified for Hartec about the difficulty in assembling the piping. They also testified that the piping was installed correctly. In opposition to this testimony was that of Mike LeCompte and John Amedee[15] who testified about pipe misalignment problems. The court found:
The court is satisfied based on the evidence presented that there was no deficiency in the plans and specifications of GSE with regard to the rigid piping system. The Waterworks District experienced a number of problems with the piping system, but those problems were attributable to the fault of Hartec in failing to respect and strictly adhere to the Loplans and specifications furnished to it by GSE. The evidence causes this *390 court to believe that Hartec’s failure to strictly abide by the engineer’s plans and specifications caused unnecessary stress in the piping system. This [led] to the development of, among other things, a leak in the piping system at the old adjacent plant and the fracture of at least one pump. In addition, Hartec’s failure in this regard led to the excessive use of filler flanges, contrary to the owner’s reasonable expectations.
As previously noted where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Rosell, 549 So.2d at 844. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 858 (La.1990). We cannot say that the trial court’s conclusions are clearly wrong or manifestly erroneous, and we find no manifest error in the finding that GSE’s plans and specifications were adequate.
Hartec also complains that Waterworks failed to prove the amounts needed to finish the project and it was error for the court to award the $1,492,637.16 to Waterworks. The court listened to the testimony of Sonny Launey, Arthur De-Fraites, John Amedee, Stephen Hornsby, Scott Chehardy, and others.[16] The judge also received numerous documents and a stipulation by the parties as to the amounts paid and work performed (these stipulations did not address whether the amounts were due to Hartec’s failure to complete the project, however). We find no manifest error in the court’s findings.
Additionally, in these assignments of error, Hartec argues that any claims against it are barred by La. R.S. 9:2771 providing for contractor immunity. The trial court considered this argument and found:
|aiThe court notes that the statute provides the claimed immunity for destruction, deterioration, or defects in a project only if the contractor constructed “the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault of insufficiency of the plans or specifications.” The statute has no application in this case because the court believes (1) Hartec did not perform its work according to the plans or specifications furnished by GSE, and (2) any destruction, deterioration, or defect in the project was not due to any fault or insufficiency in the plans or specifications furnished to Hartec.
Concluding that the trial court did not commit manifest error in its factual finding that Hartec did not perform its work according to the plans and specifications, we agree that Hartec has no immunity under this statute.
Assignment of Error No. 8: The lower court erred in assessing legal interest from the date of judicial demand.
The judgment orders interest from April 21, 2003, the date of judicial demand. Hartec submits that this is error and interest on any award should not begin until the date the amount owed was incurred and ascertainable. Interest on *391 awards for active breaches of contract begins to run “from the moment” of an active violation of a contract.[17] L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354, p. 27 (La.App. 1st Cir.6/23/00), 762 So.2d 1223, 1239, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438. Hartec abandoned the job on June 26, 2002. Hartec was placed in default on March 26, 2001, and the contract provided for liquidated damages in such a ease. Interest could be due from the date of default or the date they ceased work. However, Waterworks did not file an answer to the appeal and has made no argument that interest should begin on either date. Under common law, interest is considered punitive in nature. Civil law doctrine, instead, considers damages as reparation due the creditor. The modern concept of interest considers it additional compensation or damages for the |22loss of the use of money. Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 583 So.2d 443 (La.1991). Finding no error in the award of interest from date of judicial demand, April 21, 2003, we affirm that part of the judgment.
Assignment of Error No. 9: The lower court erred in rejecting the surety defenses of waiver and overpayment and holding West American Insurance Company liable for amounts in excess of the unpaid portions of the contract balance.
West American argues that Waterworks’ actions approving of and paying for the work performed by Hartec, as inspected and approved by GSE, has impaired its subrogation rights. It suggests that Waterworks certified the work as being 98.6% complete and made payments for which Waterworks later claimed included defective work. West American suggests that the most it can be liable for is the amount that was -withheld ($416,664.47) and not paid by Waterworks to Hartec. We again note the trial judge’s reasons in regard to this position and find it persuasive. He found:
Hartec’s position is based on the fact that Hartec’s pay applications were approved by GSE and that each application on which GSE signed off declared that the application met the requirements of the contract documents. Each certification stated that the “application” met the requirements of the contract documents, not that the work had been performed in a proper manner or that the final product would be acceptable to the owner. In fact, the contract documents specifically provide that the engineer’s certification for payment is a representation to the owner, not the contractor, that the work is in accordance with the contract documents to the best of the engineer’s knowledge, information, and belief. The contract documents specifically declare that the approval of an application for payment by .the engineer is not a representation that there may be other matters or issues between the parties that might entitle the owner to withhold payment to the contractor.
We conclude the trial court was correct, and for these reasons, we find no error in this finding.
CONCLUSION
For the foregoing reasons, the judgment is reversed for the failure to provide the additional compensation to Hartec Corporation in the amount of | ^$45,939.49, and the judgment is amended to award this amount to it. In all other respects, the *392 judgment in favor of Waterworks is affirmed. Costs are assessed equally between both parties.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
WHIPPLE, J., concurs for reasons assigned.
McCLENDON, J., concurs and assigns reasons.

. Benjamin David Jones, Conflicting Results: The Debate in Louisiana Courts over the Proper Method of Appellate Review for the Inconsistent Verdicts of Bifurcated Trials, 56 Loyola Law Review 995 (2010).

. We have used the term "Waterworks” to refer to Consolidated Waterworks District No. 1; appellant, however, has chosen to refer to it as "CWW.”

. Louisiana Code of Civil Procedure article 1562 provides in pertinent part:
A. If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, at any time prior to trial the court may order, with the consent of all parties, separate trials on the issues of liability and damages, whether or not there is to be a jury trial on either issue.
D. If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, at any time prior to trial the court may order, with the consent of all parties, separate trials on the issue of insurance coverage, unless a factual dispute that is material to the insurance coverage issue duplicates an issue relative to liability or damages. The issue of insurance coverage shall be decided by the court alone, whether, or not there is to be a jury trial on the issue of liability or damages.

. Louisiana Revised Statutes 13:5105(A) provides:
No suit against a political subdivision of the state shall be tried by jury. Except upon a demand for jury trial timely filed in accordance with law by the state or a state agency or the plaintiff in a lawsuit against the state or state agency, no suit against the state or a state agency shall be tried by jury.

. 56 Loy. L.Rev. 995, 1015. "Citations omitted.”

. Cornish v. State Dept. of Transp. & Dev., 93-0194 (La App. 1 Cir. 12/1/94), 647 So.2d 1170, 1178-1179, writs denied, 95-0547 (La.5/5/95), 654 So.2d 324.

.56 Loy. L.Rev. 995, 1018. "Citations omitted.”

. 56 Loy. L.Rev. 995,' 1020-1021. “Citations omitted.”

. 56 Loy. L.Rev. 995, 1024.

. 56 Loy. L.Rev. 995, 1022-1023. "Citations omitted.”

. 56 Loy. L.Rev. 995, 1018. "Citations omitted.”

. In Thornton v. Moran, Moran ran into the rear of Thornton’s vehicle. Each filed suit and the suits were consolidated for trial. Only Moran requested a jury trial. The jury found in favor of Moran and awarded him $90,000.00 in damages. The judge found that Moran had the last clear chance to avoid the accident and awarded Thornton $8,250 in solido with the insurer and $1,993.50, individually. The appellate court found the jury verdict to be the most reasonable. Thornton, 348 So.2d at 82.
In Cornish v. State Dept. of Trans. & Dev., 647 So.2d at 1176 & 1183-1184, Cornish drove into a cattle guard and sued DOTD for failure to place adequate warning signs on the highway and Ponchatoula Homestead and Savings Association as the owner of the guard for having a hazardous obstacle and failing to warn. The jury, deciding the Ponchatoula portion, allocated the following fault: DOTD-50%, Cornish-25%, Ponchatoula-25%. The judge, deciding the case against DOTD, found the following fault: DOTD-50%, Ponchatou-la-35%, Cornish-15%. The appellate court found both allocations to Cornish to be erroneous and allocated 50% to him.
In Eppinette v. City of Monroe, 698 So.2d at 663, 667-668, & 671, Eppinette was injured at a municipal airport by contact with an electric fence. Suit was filed against the city and the construction company that erected the fence. The judge allocated 25% of the fault to the city and 75% to the construction company and awarded the plaintiff $130,883.92. The jury allocated fault at 50% to each defendant and awarded the plaintiff $111,000. The appellate court found neither verdict to be manifestly erroneous in the allocation of fault, but that the judge’s allocation was more reasonable. As for damages, the court found that the jury's award for medical expenses and loss of future earnings and earning capacity were manifestly erroneous; thus, it affirmed the judge’s awards. As for general damages and loss of consortium, the court found the judge's award of general damages was more reasonable, and the jury’s award for loss of consortium was more reasonable.
In Deville v. Town of Bunkie, 364 So.2d at 1379-1380 & 1362, Deville sued two police officers and the town for the use of excessive force in making an arrest and mistreatment. The jury found one officer liable and, therefore, the insurer for the town. The judge found both officers used reasonable force and neither was liable. The appellate court found the judge’s verdict to be more reasonable.
In McDaniel v. Carencro Lions Club, 934 So.2d at 952-953, 967-968, & 977-980, McDaniel fell into the orchestra pit during a concert. He sued the city who owned the venue, the social club who rented it, and the concert promoter. In the case involving the city, the judge apportioned fault as follows: McDaniel-75%, city-15%, social club-2%, and promoter-8%. The jury assigned fault as follows: McDaniel-35.5%, city-41.5%, club-2%, promoter-21%. The judge made a total damage award of $272,589.00 and the jury awarded $395,598.00. The appellate court found error in both judge and jury in assign *384 ing fault to the plaintiff and reduced his fault to 25%. They found the judge's finding of 8% fault on the promoter to be more reasonable and found the city should be 65% at fault. They found portions of each verdict on damages to be manifestly erroneous and, after accepting the awards it deemed reasonable, amended the total award to $409,357.
In Hebert v. Rapides Parish Police, 934 So.2d at 915-917 & 924-926, Hebert hit a bridge rail and her family sued the police jury, DOTD, and the contractor that built the bridge. The contractor was dismissed and the police jury requested a bench trial and DOTD a jury trial. The jury found each defendant to be 50% at fault and gave an award of $1,568,871.24. The judge allocated fault of 40% to the police jury, 60% to the driver, and no liability to DOTD with an award of $1,380,066.00. The appellate court assessed fault at 10% to the driver, 50% to DOTD, and 40% to the police jury and made its own damage award of $1,653,591.50.
In Aubert v. Charity Hospital of Louisiana, 363 So.2d at 1225 & 1231-1232, a woman died during childbirth. Suit was filed against the public hospital, anesthesiologist, nurse anesthetist, and several administrators. The jury found no liability on any defendant. The judge, however, found the hospital liable vicariously for the negligence of the two employees, but did not find them individually liable. The appellate court found the judge’s verdict to be more reasonable except found the anesthesiologist and nurse anesthetist to be personally liable.
In American Casually Co. v. Ill. Central Gulf R.R., 601 So.2d at 713 & 718, the plaintiff was injured at a railroad crossing and sued the railroad and St. Charles Parish. The jury allocated fault: plaintiff-46%, parish-31%, railroad-23%. The judge assigned fault as follows: plaintiff-65%, parish-10%, leaving 25% unassigned. The jury awarded damages of $105,000.00; the judge awarded damages of $205,000.00. The appellate court found the judge's verdict to be the more reasonable including 25% fault on the railroad by implication and also found his damage award to be more reasonable.

. Louisiana Civil Code article 2323(A) provides:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provi *385 sions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

. Ted Hicks is the owner of Hartec, Chris Hicks is the son of Ted Hicks, and Steve Freeman was Hartec’s project manager on this project.

. Mike LeCompte is a staff engineer for Waterworks and John Amedee is a project supervisor for Volute, Inc., a general mechanical contractor that performed repair work on the project.

. Sonny Launey is a civil engineer called as an expert by Waterworks, Arthur DeFraites, is the owner/manager of GSE, Stephen Hornsby is general manager of Waterworks, and Scott Chehardy was the field engineer for GSE on the project.

. Louisiana Civil Code article 1989 provides: Damages for delay in the performance of an obligation are owed from the time the obli-gor is put in default. Other damages are owed from the time the obligor has failed to perform.